# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 13, 2004 Session

## STATE OF TENNESSEE v. JAMES CHITWOOD

**Appeal from the Criminal Court for Clay County**
**No. 4075     Lillie Ann Sells, Judge**

---

### No. M2003-01148-CCA-R3-CD - Filed March 12, 2004

---

The defendant, James Chitwood, pled guilty in the Clay County Criminal Court to aggravated assault and agreed to a five-year sentence as a Range I, standard offender with the manner of service to be determined by the trial court. After a sentencing hearing, the trial court ordered that the defendant serve his entire sentence in confinement. The defendant appeals, claiming that he should have received an alternative sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Edgar (Eddie) Taylor, III, Hartsville, Tennessee (on appeal), and Brody Neill Kane, Lebanon, Tennessee (at trial), for the appellant, James Chitwood.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William Edward Gibson, District Attorney General; and John A. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's shooting Samantha Shrum, his live-in girlfriend. At the guilty plea hearing, the state presented the following factual account of the crime: In the early morning hours of April 11, 2002, an ambulance was dispatched to 107 Steven Ridge Road. When it arrived, the defendant told emergency medical technicians (EMTs) that he had been outside investigating a noise when the victim came outside and startled him. The defendant said he turned around and accidentally shot the victim in the abdomen with a .357 handgun. At first, the victim also claimed that the defendant had shot her accidentally. However, four days later, she told her parents that she had lied. She said that the defendant put the gun to his head in order to commit suicide, that she tried to knock the gun out of his hand, and that the defendant pushed her backward onto the bed. The victim stated that she closed her eyes, heard the defendant walking around the room, heard the

gun fire, and was shot. During an interview on April 19, the defendant told a police officer that he put the gun to his head to commit suicide and that the victim tried to grab the gun away from him. He told the officer that he and the victim struggled over the gun and that he accidentally shot her as they fell onto the bed.

At the sentencing hearing, Special Agent Steve Huntley of the Tennessee Bureau of Investigation testified that he investigated the case. He said that soon after the shooting, the defendant told a police officer at the scene that the victim had walked up behind him and that the gun had fired accidentally. He said that on April 19, the defendant gave a sworn statement in which the defendant said the following: The defendant recently had received child custody papers from his ex-girlfriend. He got a gun, put it to his head, and was going to kill himself. When the victim tried to take the gun away from him, it accidentally fired and shot her. According to the statement, the defendant telephoned 9-1-1 immediately after the shooting. Agent Huntley said that he did not believe the defendant was truthful in the statement because the victim had told him that the defendant delayed calling 9-1-1 and turned on fans in the house in order to eliminate the smell of gunpowder.

Agent Huntley testified that the defendant gave a statement on July 15, 2002, in which the defendant gave a third account of the incident: The defendant and the victim had been arguing before the shooting. The defendant put the gun to his head and felt something hit or pull him. When he opened his eyes, he saw that the victim had been shot. He went through the house and turned on fans in order that the police and EMTs would not smell gunpowder. He then telephoned 9-1-1 and made up the story about shooting the victim outside. The defendant told the victim he was going to tell the story to the police, and she said okay. Agent Huntley testified that he did not think the defendant was truthful in the July 15 statement because the victim had said that there was a time delay between her touching the defendant and his shooting her. He said the victim also said she heard the defendant cock the gun before the shooting. He said that if the defendant had shot the victim while they struggled over the gun, gunpowder burns would have been on the defendant's chest and shirt.

On cross-examination, Agent Huntley acknowledged that more than one bullet was in the gun and that the defendant had the opportunity to kill the victim. He acknowledged that the victim told him the defendant had made suicide threats before. He said the victim told him she agreed to go along with the defendant's first story because she was afraid.

Carmen Shrum, the victim's mother, testified that the victim was eighteen years old at the time of the shooting. Before the shooting, the victim was healthy and active but after the shooting, the victim could not walk and had to wear diapers. Mrs. Shrum said that doctors told her the victim was permanently paralyzed and that they did not know if the victim would regain control of her kidneys or bowel. She said the victim was in the hospital for nineteen days, spent three weeks in an in-patient care facility, and took many medications daily. She said that at the time of the hearing, the victim went to therapy three times per week and that she looked after the victim full time. She said that the victim could walk a little with a walker and a leg brace and that the defendant had never apologized for shooting the victim. On cross-examination, she acknowledged that the defendant

could not talk to the victim as a condition of his bond. She also said the defendant offered to move in with her family and help take care of the victim.

Joan Tillman, the defendant's mother, testified that the defendant's father committed suicide when the defendant was only twenty-two months old. She said that after the suicide, the defendant did not talk for a year and would scream if he heard a loud noise. She said that the defendant's paternal grandfather also committed suicide and that she expected the defendant to do the same. She said that the defendant used to work for Unipress and that he had a four-year-old daughter. She said the defendant provided for his daughter and was sorry about shooting the victim. She said the defendant had never abused drugs and would not be a danger to society if released on probation. On cross-examination, Ms. Tillman testified that the defendant had never received any mental health treatment. She also said she had heard the defendant and the victim argue before.

Michael Kelly testified that he used to work with the defendant at Unipress and that he had known the defendant for about six years. He said the defendant was a good employee and always came to work on time. He said the defendant currently was hanging sheetrock for Mr. Kelly's drywall business. On cross-examination, he testified that the defendant told him the defendant shot the victim accidentally while the defendant was looking for prowlers.

The defendant testified that on the day of the shooting, he got home from work about 3:15 a.m. and talked with the victim for about thirty minutes. He said that he began reading the custody papers he had received and that the victim started arguing with him and accusing him of wanting to get back together with his ex-girlfriend. He said he went into another bedroom, got a gun, and was going to kill himself. He said that the victim came in, that they struggled over the gun, that they fell onto the bed, and that the victim told him she had been shot. He said he turned on fans in order to get the smell of gunpowder out of the house and telephoned 9-1-1. He said he initially lied about the shooting because he was scared and did not want to get into trouble. He said he loved the victim and was sorry for the shooting. He said that he had threatened suicide four or five times before and that the victim always had stopped him.

On cross-examination, the defendant testified that he called 9-1-1 only one or two minutes after the shooting. He acknowledged that his call was audiotaped and that he could be heard saying on the tape, "[S]hut up, we'll say this was an accident." He said that he had a gunpowder burn on his shirt but that he did not show it to anyone. On redirect examination, he said he told the victim to shut up after the shooting because she was screaming and he could not hear.

The presentence report shows that the then twenty-four-year-old defendant completed the eleventh grade and never obtained his GED. It reflects that the defendant worked for Unipress for over four and one-half years and that he also worked for Junior Foods and Davis Brothers Saw Mill. In the report, the defendant stated that his health was good, that he drank alcohol occasionally, and that he did not use illegal drugs. The report shows that the defendant had a drug screen on March 19, 2003, which was negative.

The trial court noted that although the defendant was eligible for probation, he had the burden of showing that he was suitable for probation. The trial court then stated that it was "not impressed with the defendant's testimony" and that it did not believe the defendant was truthful at the hearing. The trial court stated that it was troubled by the fact the defendant turned on fans after the shooting and delayed calling 9-1-1. The trial court held that the facts of the case and the victim's severe physical injuries carried great weight. Although the trial court stated that it had considered the defendant's good employment history and lack of a criminal record, it determined that the need for deterrence and the need to avoid depreciating the seriousness of the offense warranted denying the defendant's request for probation.

The defendant claims that the state failed to rebut the presumption that he is a favorable candidate for alternative sentencing because it failed to show that he has a prior criminal record or that he cannot be rehabilitated. In addition, he claims that the trial court erred by denying his request for probation based upon its determining that confinement was needed to avoid depreciating the seriousness of the offense. He claims that as a result of the trial court's error, this court should review the defendant's sentence de novo with no presumption of correctness. The state claims that the trial court's denying the defendant's request for probation was warranted based upon the trial court's determining that the defendant was not truthful, which shows that he is not amenable to rehabilitation. The state also contends that the trial court properly denied probation based upon the need to avoid depreciating the seriousness of the offense because the victim suffered serious injuries and the defendant tried to cover up his crime. We hold that the trial court did not err by ordering that the defendant serve his entire sentence in confinement.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). However, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When determining if incarceration is appropriate, a trial court should consider whether (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is needed to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) less restrictive measures than confinement have frequently or recently been applied unsuccessfully to the defendant. Ashby, 823 S.W.2d at 169 (citing T.C.A. § 40-35-103(1)(A)-(C)). The trial court may also consider the mitigating and enhancing factors set forth in T.C.A. §§ 40-35-113 and -114. T.C.A. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435,

438 (Tenn. Crim. App. 1996). In addition, a trial court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); Boston, 938 S.W.2d at 438. In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168. As a Range I, standard offender convicted of a Class C felony, the defendant is presumed to be a favorable candidate for an alternative sentence in the absence of evidence to the contrary. See T.C.A. § 40-35-102(6).

Initially, we note that the trial court's findings as to the sentence are entitled to a presumption of correctness because the record reflects that in denying full probation, the trial court considered the relevant facts, circumstances, and sentencing principles. Regarding the trial court's denying an alternative sentence based upon the need to avoid depreciating the seriousness of the offense, in order for this provision to apply, the circumstances of the offense must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981); State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991). In this case, the trial court stated that it was "absolutely shocked and appalled" that the defendant claimed he shot the victim accidentally, yet made up a story to the police, turned on fans in order to get the smell of gunpowder out of the house, and delayed calling 9-1-1. The victim suffered severe physical injuries, resulting in her losing the ability to walk and control her bodily functions. Given these circumstances, we believe the trial court properly denied full probation based upon a need to avoid depreciating the seriousness of the offense. Moreover, the trial court stated that it did not believe the defendant testified truthfully at the hearing, and a lack of candor may be a major factor for denying probation. See State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990); State v. Jenkins, 733 S.W.2d 528 (Tenn. Crim. App. 1987). Although factors such as the defendant's lack of a prior criminal record and good employment history weigh favorably toward granting an alternative sentence, the defendant has not overcome the presumed correctness of his sentence. We conclude that the defendant's lack of candor coupled with the circumstances of the offense justify the denial of an alternative sentence.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE