IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 14, 2004

## STATE OF TENNESSEE v. LOUISE DAWSON MARLOW

**Direct Appeal from the Circuit Court for Coffee County**
**No. 31,478     L. Craig Johnson, Judge**

_____

**No. M2003-00082-CCA-R3-CD - Filed February 17, 2004**

_____

The defendant entered a plea of nolo contendere to reckless homicide and agreed to a sentence of seven years as a Range II, multiple offender. The manner of service of the sentence was to be determined following a sentencing hearing. The trial court ordered the defendant to serve one year in the county jail followed by six years in community corrections. The defendant contends on appeal that the trial court erred in requiring any confinement in this case. We conclude that the defendant is not eligible for community corrections and remand for re-sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, Louise Dawson Marlow.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; C. Michael Layne, District Attorney General; and Kenneth J. Shelton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In October of 2001, the defendant, Louise Dawson Marlow, was indicted for the first degree murder of her husband, Joe Howard Marlow. She entered a plea of nolo contendere to reckless homicide, a Class D felony, and agreed to a sentence of seven years as a Range II, multiple offender. The manner of service of the sentence was to be determined following a sentencing hearing. The trial court ordered the defendant to serve one year in the county jail followed by six years in community corrections. The defendant contends on appeal that the trial court erred in requiring any confinement in this case. We conclude that the defendant is not eligible for community corrections and remand for re-sentencing.

**Facts**

The following factual account is taken from the presentence report introduced into evidence at the sentencing hearing.

On February 7, 2000, [the victim] arrived at his home. [The victim] exited his vehicle and headed for his back door. [The co-defendant] stepped out of the laundry room (located on the carport) and shot [the victim] two times. As the victim fell to the ground, [the co-defendant] fled on foot. The victim's wife, [the defendant], came outside and found the victim laying on the carport in a pool of blood. She ran back inside the home, called 911 and grabbed several towels. When law enforcement officers arrived at the scene they found [the defendant] sitting on the carport with the victim's head in her lap. She was rocking back and forth saying "Why - who did this?" The victim was taken to the hospital and flown via life flight helicopter to Vanderbilt Hospital where he died from his wounds. Medical reports show that the victim was shot once in the arm with the bullet traveling through the arm and into his torso and once in the head. The ensuing investigation was conducted by the Coffee Co. Sheriff's Dept., the 14th Judicial District Attorney General's Office and the Tennessee Bureau of Investigation. Investigators received a phone call from the sister of [the co-defendant] in July 2001 reporting that he had been bragging about shooting the victim and that he and his wife, Laurie, had disposed of the weapon. Investigators brought [the co-defendant] in for questioning. [The co-defendant] admitted that he had shot the victim and stated that it was done at the request of [the defendant], the victim's wife. [The co-defendant] agreed to wear a wire and talk with [the defendant] about the murder of her husband. [The co-defendant] had taped conversations with [the defendant] on July 12th, 13th, 24th and 30th of 2001. In these conversations, [the defendant] implicated herself in arranging for the murder of her husband.

On the night of the murder, [the co-defendant] went to the home where [the defendant] gave him a Smith and Wesson .38 Special (the property of the victim) and concealed him in the laundry room. When the victim arrived home, [the co-defendant] stepped out of the laundry room and shot the victim two times. [The co-defendant] fled on foot to his home. [The co-defendant] and his wife, Lauire [sic], would later dispose of this weapon by throwing it in a lake.

The first witnesses to testify at the sentencing hearing were Billy Cook, an investigator for the district attorney's office, and Kendall Barham, an agent with the Tennessee Bureau of Investigation. They communicated with the defendant on numerous occasions throughout the course of the twenty-month investigation into the victim's death. The defendant appeared to be cooperating and even gave the investigators the names of several potential suspects that she thought might have been involved. The co-defendant, Roger Dale Wimley, agreed to cooperate with the authorities in July of 2001. He stated that the defendant called him to the residence on February 5, 2000, gave him a gun, and told him to shoot the victim as he was walking to the door. The co-defendant showed the

police the location of the weapon used in the shooting. He also agreed to wear a recording device and engage the defendant in conversation about the victim's death. Transcripts of the four recorded conversations were entered into evidence at the sentencing hearing. The transcripts of the recorded conversations revealed several incriminating statements made by the defendant. Apparently referring to the shooting of the victim, the defendant stated on July 12 that she was "not a bit sorry about that. Not when I get to sleep at night." On July 13, the following exchanges occurred between the defendant and co-defendant:

[Co-defendant]: You know, you know I killed [the victim] for you?
[Defendant]: A good thing.
. . .
[Co-defendant]: I'll hide. I just . . .
[Defendant]: That's the wrong thing to do is run. That's the wrong thing to do. You run, they're going to know you killed him. I didn't see nothing and I don't know nothing. I've done told them and they've never associated you with it. It's all in your head. You run and you're going to look bad.
. . .
[Defendant]: Honey, nobody's watching you. Don't be scared. And if you tell anyone you done that for me, they'll hang me from the highest tree and take everything I got.

During the July 24 conversation, the defendant and co-defendant made the following statements in discussing the location of the gun used by the co-defendant in the shooting:

[Co-defendant]: Huh, the one that shot [the victim]?
[Defendant]: I thought that was in the bottom of the lake.
[Co-defendant]: I don't know.
[Defendant]: You all didn't take it there?

Becky Stevens, a daughter of the victim and defendant, testified at the sentencing hearing. She stated that the victim was seventy-six years old at the time of his death. She never witnessed any type of physical abuse by her father. The defendant never indicated to Stevens that she was afraid of the victim. According to Stevens, as a result of the victim's death, the defendant gained control over the family's land and part of their winery. The record indicates that the real estate was valued at almost three million dollars, and the winery was valued at five hundred thousand dollars. Stevens said that she thought the defendant should be required to serve the entire seven-year sentence. The defendant had never admitted to Stevens that she killed the victim. Stevens said that the defendant has always maintained the appearance that she wanted to find out who is responsible.

Julia Henson, another daughter, also testified at the sentencing hearing. She lived with her parents until she was twenty-eight years old. Henson said that she witnessed physical and verbal abuse by the victim toward the defendant on numerous occasions. Several times, the victim wrapped a telephone cord around the defendant's neck and attempted to choke her. She also recalled an incident where the victim picked up a camping grill and was about to throw it through the windshield of the family car with the defendant inside until Henson intervened. Henson also stated that the victim hit the defendant and knocked her down soon after the defendant's hysterectomy. The

defendant had to be hospitalized and have additional surgery on her bladder.  Henson testified that the defendant told her that she did not know who killed the victim.

Alicean Marlow, one of the granddaughters of the victim and defendant, testified that she never witnessed any type of abuse by the victim.  There was no indication that the defendant was afraid of the victim.  The witness stated in her victim impact statement that the defendant "should receive the maximum sentence possible."

The defendant entered into evidence records indicating that the defendant had filed for divorce from the victim in 1982 and again in 1986.  The divorce filings alleged abuse by the victim.  Both actions were dismissed by the defendant.  The defense also introduced a copy of a lawsuit filed by Becky Stevens and her brother against the defendant alleging the wrongful death of the victim.  The State agreed to stipulate that the victim was prosecuted sometime in the 1970's for insurance fraud and was found not guilty.  The defense also introduced forty-five letters from people in the community expressing their belief in the defendant's innocence and attesting to her good character.  The depositions of Doctors Scoville and Spangler were introduced by the defendant.  The depositions indicated that the defendant is an insulin-dependent diabetic.  She experienced a major stroke in 1998 and suffered three additional stroke events in 2002.  In May of 2002, she had one stint placed in a coronary arteriy to relieve severe blockage, and two more were inserted in July of that year.  The defendant remains at "[v]ery, very high risk" for a stroke or heart attack due to a "history of hypertension, hyperlipidemia, [and] diabetes," due to stress.

**Analysis**

The defendant contends on appeal that the trial court erred in requiring any confinement in this case.  This Court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness.  Tenn. Code Ann. § 40-35-401(d).  This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances.  State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999).  If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*.  State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper.  Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.  In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210(b), to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

-4-

In determining if incarceration is appropriate, a trial court should consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A court may also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and -114 as they are relevant to the section 40-35-103 considerations. Tenn. Code Ann. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); Boston, 938 S.W.2d at 438. The defendant's lack of credibility is also an appropriate consideration and reflects on a defendant's potential for rehabilitation. State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999).

Under the Criminal Sentencing Reform Act of 1989, trial judges are encouraged to use alternatives to incarceration. An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(b). In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Boyd, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995). Even though probation must be automatically considered, "the defendant is not automatically entitled to probation as a matter of law." Tenn. Code Ann. § 40-35-303(b), Sentencing Commission Comments; State v. Hartley, 818 S.W.2d 370, 373 (Tenn. Crim. App. 1991). A defendant seeking full probation bears the burden on appeal of showing that the sentence imposed is improper and that full probation will be in the best interest of the defendant and the public. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. Tenn. Code Ann. § 40-35-103(2); State v. Batey, 35 S.W.3d 585, 588-89 (Tenn. Crim. App. 2000). Indeed, individualized punishment is the essence of alternative sentencing. State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986).

After reviewing the record, we conclude that the trial judge considered the sentencing principles and all relevant facts and circumstances; therefore, our review is *de novo* with a

presumption of correctness. The trial court ordered the defendant to serve one year in county jail and the remainder of the seven-year sentence in community corrections. The defendant, who was sentenced as a multiple offender, concedes that she is not eligible for the presumption that she is a favorable candidate for alternative sentencing. The defendant first contends that the trial court erred by applying non-statutory enhancement factors and failing to apply certain mitigating factors in determining the manner of service of the sentence. The State submits that the trial court was not required to consider and apply enhancement and mitigating factors because the only issue was the manner of service of the sentence, not the length of the sentence. Although the State's argument is incorrect, we find no error in the trial court's determinations on this issue. In "[determining] the specific sentence and the appropriate combination of sentencing alternatives . . . the court shall consider the . . . [e]vidence and information offered by the parties on the enhancement and mitigating factors." Tenn. Code Ann. § 40-35-210(b)(5). In making its sentencing determination, the trial court made the following remarks:

> The proof showed that the defendant was aware of the perpetrator's actions. The proof also confirmed her apparent attempts to hide the facts from the authorities. The defendant has never expressed any remorse or sorrow to the Court. It is apparent that [the defendant's] actions placed into motion a series of events that resulted in the death of [the victim], and the Court cannot and must not overlook that fact. No matter how one viewed [the victim], the fact still remains that an unlawful death occurred as a result.

The trial court then discussed the application of various statutory enhancement and mitigating factors. Taken in context, the statements complained of by the defendant appear to simply be comments by the trial court concerning the facts and circumstances surrounding the events of the case. In no way did the court suggest it was using these "factors" to enhance the defendant's sentence. The defendant also argues that the trial court erred by failing to consider as mitigating factors the alleged abuse by the victim and the defendant's fear for her safety. While not specifically finding that the alleged abuse was a mitigating factor, the trial court did make the following statements: "The defendant's witnesses offered numerous reasons to justify the actions of [the defendant]. They included fear, domestic violence, as well as self-preservation. Although these reasons may explain [the defendant's] actions, they do not legally justify the resulting death that occurred." While the court did not find these to necessarily be statutory mitigating factors, the court obviously did consider these allegations in determining the manner of service of sentence. The defendant has failed to show any reversible error concerning this issue.

The defendant next contends that the trial court erred in finding that incarceration is appropriate because of a need to avoid depreciating the seriousness of the offense and because of a need for deterrence to others likely to commit similar offenses. First, the court found that confinement is necessary to avoid depreciating the seriousness of the offense. See Tenn. Code Ann. § 40-35-103(1)(B). For this provision to apply, the circumstances of the offense "as committed, must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985) (overruled on other grounds by

State v. Hooper, 29 S.W.3d 1 (Tenn. 2000)) (quoting State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981)). The defendant was convicted of reckless homicide, which is defined as "a reckless killing of another." See Tenn. Code Ann. § 39-13-215(a). The defendant's actions went well beyond that required to establish that she acted recklessly. The record indicates that the defendant actively solicited, planned, and covered up the premeditated murder of the victim. Her actions were clearly of an "excessive or exaggerated degree." The trial court did not err in finding that incarceration is necessary to avoid depreciating the seriousness of the offense.

In addition to the sentencing principle discussed above, the trial court found that confinement is necessary because there is a need for deterrence to others likely to commit similar offenses. See Tenn. Code Ann. § 40-35-103(1)(B). The Tennessee Supreme Court has held:

> [A] trial court's decision to incarcerate a defendant based on a need for deterrence [will be presumed to be correct] so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000). To determine whether there is a need for deterrence, the following nonexclusive list of factors should be considered: (1) whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or state as a whole; (2) whether the crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from criminal behavior; (3) whether the alleged offense received substantial publicity beyond that normally expected in a typical case; (4) whether the defendant was a member of a criminal enterprise or substantially encouraged or assisted others in achieving the criminal objective; and (5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions. Id. at 10-12. "[A] court need not find that all of these factors are present before ordering incarceration based on a need to deter similar crimes." Id. at 12. The Tennessee Supreme Court stated that "[b]ecause the 'science' of deterrence is imprecise at best, the trial courts should be given considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need." Id. at 10.

The record shows that this crime was a result of intentional conduct on behalf of the defendant. Additionally, the defendant may have been motivated by a desire to profit or gain from her criminal behavior. As a result of the victim's death, the defendant gained control over the family's land and part of their winery. The record indicates that the real estate was valued at almost three million dollars, and the winery was valued at five hundred thousand dollars. Although the defendant contends on appeal that this case did not receive substantial publicity beyond that in a typical case, a "Motion for Sequestered Voir Dire" filed by the defendant states that "this cause has received widespread publicity." As evidence of the widespread publicity, the defendant attached as an exhibit some thirteen articles from various newspapers. Obviously, the defendant encouraged and assisted others in achieving the criminal objective. The record supports the trial court's finding that incarceration is appropriate to serve as a deterrence to others.

Additionally, we conclude that the defendant's lack of remorse, lack of candor, and untruthfulness also support the denial of probation in this case. See Tenn. Code Ann. § 40-35-103(5); State v. Pierson, 678 S.W.2d 905, 906 (Tenn. 1984); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Williamson, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); State v. Dowdy, 894 S.W.2d 301, 305-06 (Tenn. Crim. App. 1994). The defendant has never admitted involvement in the killing of the victim. Throughout the course of the twenty-month investigation prior to her arrest, she gave false information to the authorities implicating persons not involved with the crime. She repeatedly stated that she wanted to find out who was responsible. As was indicated by the family members who testified at the sentencing hearing, the defendant has maintained her innocence throughout the proceedings. The defendant's refusal to accept responsibility for her actions demonstrates that she is a poor candidate for rehabilitation.

Although not raised by either party on appeal, we conclude that the defendant is not eligible for a community corrections sentence because she was convicted of reckless homicide, a crime against the person. See Tenn. Code Ann. § 40-36-106(a)(1)(B). A defendant who does not meet the general criteria for eligibility may qualify for community corrections based upon certain special needs. Id. § 40-36-106(c). The applicable portion of the statute defines special needs as "histories of chronic alcohol, drug abuse, or mental health problems." Id. The trial court found that "[the defendant] has special needs in regard to her health." The record does not establish that the defendant has any of the special needs enumerated by the statute. The defendant's physical health problems do not qualify her for community corrections eligibility under the special needs provision. The trial court erred in imposing a sentence of community corrections in this case. We remand for resentencing of the defendant, consistent with this opinion.

**Conclusion**

Based on the foregoing reasoning and the record as a whole, we conclude that the defendant is not eligible for community corrections and remand for resentencing.


_____
JOHN EVERETT WILLIAMS, JUDGE