IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. JAMES DALE WALKER

**Appeal from the Circuit Court for Blount County**
**Nos. C-12949 and C-12950    D. Kelly Thomas, Jr., Judge**

---

**No. E2003-01372-CCA-R3-CD**
**March 25, 2004**

---

The defendant, James Dale Walker, pled guilty in the Blount County Circuit Court to aggravated sexual exploitation of a minor, a Class C felony, and sexual exploitation of a minor, a Class E felony. Pursuant to the plea agreement, the defendant received concurrent sentences of six and two years, respectively, as a Range I, standard offender. The manner of service of the sentences was to be determined by the trial court. After a sentencing hearing, the trial court ordered that the defendant serve his sentences in total confinement. On appeal, this court reversed and remanded, ordering that the trial court reconsider a sentencing alternative to confinement in the Department of Correction (DOC). See State v. James Dale Walker, No. E2002-00263-CCA-R3-CD, Blount County (Tenn. Crim. App. Oct. 18, 2002). After a second sentencing hearing, the trial court ordered that the defendant serve six months in confinement and the remainder of his sentences on supervised probation. The defendant appeals, claiming that he should have received full probation. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Raymond Mack Garner, District Public Defender, for the appellant, James Dale Walker.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Robert L. Headrick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's ordering a child pornography videotape as part of an undercover law enforcement operation in May 2000. In the defendant's original appeal, this court stated the following facts:

An internet company based in Dallas, Texas, called "Landslide" had been providing access to internet websites containing child pornography. As a result of an investigation by postal inspectors and other law enforcement personnel in Dallas, the company was put out of business and taken over by law enforcement authorities as an undercover operation.

During the investigation of Landslide, law enforcement officers recovered a list of over one-hundred thousand names of customers across the country who had utilized Landslide to access child pornography websites. E-mails were sent to the twenty-five people in Tennessee who had accessed the child pornography sites most often. The Defendant was one of the twenty-five people on the list in Tennessee to whom an e-mail was sent. The e-mail stated that the Landslide company was back in business and offering the same services previously provided. The Defendant responded to the e-mail and was eventually given the opportunity to purchase child pornography videotapes. The Defendant requested a list of videos containing "pre-teen" pornography. A law enforcement officer sent the Defendant a list of available titles, including a graphic description of the sexual acts depicted in the videos and the ages of the actors. The Defendant ordered a videotape entitled "Teen Sex," which was described as depicting a nine-year old girl having sex with her father and his friend. The Defendant mailed a money order in the amount of $49.95 and requested that the video be sent to his post office box.

Id., slip op. at 2. When the defendant picked up the videotape from the post office, authorities stopped him in the parking lot. The defendant turned over his home computer to the police and told the officers that he had a problem with child pornography. Id. He pled guilty to aggravated sexual exploitation of a minor and sexual exploitation of a minor.

At the defendant's first sentencing hearing, David Dirmeyer, a United States Postal Service Inspector, testified that he confronted the defendant in the post office parking lot and that the defendant gave a statement. He said that according to the defendant, the defendant would look at child pornography over the Internet and download some of the pornographic images onto his computer. He said that at some point, the defendant would become disgusted with himself, delete the downloaded material, and "start the cycle back over again." He said a search of the defendant's home computer revealed that the defendant had deleted downloaded files, which supported the defendant's story. He said the defendant had tried to stop accessing child pornography over the Internet but could not. He said the defendant denied ever molesting children but admitted having a sixteen-year-old girlfriend when the defendant was nineteen.

On cross-examination, Inspector Dirmeyer acknowledged that the defendant was very cooperative and voluntarily told the police about the pornographic downloads on the computer. Inspector Dirmeyer said the defendant lived with his parents and allowed the police to search his bedroom without a search warrant. He said that when the officers left the home, they forgot to take the defendant's computer. He said the defendant paged him and reminded him that the officers had forgotten to take the computer with them.

Ronnie Hepperly, the pastor for Restoration International Outreach Church, testified that the defendant had been a member of his church for about two years and told him about the criminal charges. He said the defendant was very repentant and wanted Mr. Hepperly to pray with him. On cross-examination, he testified that the defendant was not involved with any of the youth programs at the church.

Joan Walker, the defendant's mother, testified that the then twenty-eight-year-old defendant had lived with her all his life. She said her three young grandchildren also lived in the home but that none of them shared a bedroom with the defendant. She said that on May 31, 2000, the defendant told her that he had accessed pornography over the Internet and that he was in trouble with the police. She said that after the defendant's bond hearing, he had his Internet access service disconnected.

The defendant testified that as a result of the charges, he was suspended from his job at Wal-Mart. He said he worked for his parents' garbage service business for a while, got a job at Hollywood Video, and was promoted to assistant manager of the video store. He said he originally began looking at child pornography on the Internet because he was lonely after breaking up with his girlfriend. He said he started attending church, realized what he was doing was wrong, and tried to stop. He said he would delete the pornography from his computer periodically but could not stop looking at it on the Internet. He said that the officers stopped him in the post office parking lot on May 31, 2000; that he began counseling sessions with Dr. Michael Buckner in June 2000; and that he was indicted for the crimes in October 2000. He said he began seeing Dr. Buckner because he realized he needed help. He said that at the time of the sentencing hearing, he was still seeing Dr. Buckner and that he would continue counseling if the trial court granted him probation. He said that through his counseling sessions, he had learned that he was molested at least three times as a young child. He said that he was sorry for what he had done and that he had not accessed the Internet or viewed child pornography since May 31, 2000.

Dr. Michael Buckner testified that he is a licensed psychologist and began counseling the defendant on June 26, 2000. He said that during one of the defendant's counseling sessions, the defendant suddenly remembered being raped by a family member when the defendant was eight or nine years old. He said that a scout master also had had an inappropriate relationship with the defendant when the defendant was ten or eleven years old. He said that these events could explain the defendant's desire for child pornography. He said that through counseling, people could change their desires and that the defendant was progressing very well and was no longer having desires for exposure to under-age sexual material. He said the defendant was immature but was "maturing more

into age-appropriate kinds of behaviors." He said that the defendant would need to continue counseling for at least another year but that he thought the defendant's likelihood of success was very high.

According to the defendant's presentence report, the defendant dropped out of high school due to poor health, obtained his GED, and attended some college classes. The defendant described his physical health as fair and stated that he suffered from migraine headaches, mouth ulcers, and frequent sore throats. He described his mental health as good and stated that he did not drink alcohol or use illegal drugs. A drug test conducted on December 27, 2001, was negative. At the time of the report, the defendant was working for Hollywood Video. The report shows that he also had worked for Blaine's Garbage Service and Wal-Mart.

The trial court determined that enhancement factor (1), that the defendant "has a previous history of . . . criminal behavior in addition to those necessary to establish the appropriate range," applied to his sentences. See T.C.A. § 40-35-114(1) (supp. 2001) (amended 2002).[1] In mitigation, the trial court considered that the defendant had been open and honest with the police, had taken steps toward rehabilitation, had maintained steady employment, and had no prior criminal convictions. See T.C.A. § 40-35-113(13). The trial court noted that the defendant was presumed to be an appropriate candidate for alternative sentencing. See T.C.A. § 40-35-102(6). However, it ruled that the state had overcome the presumption, stating as follows:

> The reason being that you have been involved in this type of illegal activity to such a degree over the last year and a half, or so, as to be, as the witness testified, in the top 25 of the people in this whole state when it comes to accessing these child-porn websites. If you had bought, out of curiosity -- or whatever reason -- one videotape, and that was it, then this would be an entirely different situation and I would say that you ought to be placed on probation and do the kinds of things that you've been doing . . . . But that is just not anywhere close to what the facts are here.
> A lack -- I think confinement is necessary to avoid depreciating the seriousness of this offense. And that, in my mind, outweighs the other things that I have considered.

On appeal, the defendant argued that the trial court erred by refusing to grant his request for some type of alternative sentence. This court agreed, reversed the trial court's ruling that the defendant should serve his sentences in total confinement, and remanded the case for resentencing. See James Dale Walker, slip op. at 7.

---

[1] The legislature's 2002 amendment to T.C.A. § 40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only by increasing their designating number by one.

During the second sentencing hearing, Michael Lane, a probation officer with the Board of Probation and Paroles, testified that after the defendant's first sentencing hearing, the defendant was released on an appeal bond. He said the conditions of the defendant's bond required that the defendant report monthly to the Board of Probation and Paroles, have no Internet access, continue counseling, neither possess nor be in a place that housed sexually explicit materials, undergo risk assessment testing and regular polygraph testing, and live with the defendant's aunt. He said that he had supervised the defendant and that the defendant had complied with all of the conditions. He said that the defendant had taken two polygraph tests and that neither test indicated deception. He said the defendant no longer worked for Hollywood Video, had mowed yards during the summer, and was trying to get a job with ProTemp. He acknowledged that the defendant had had steady employment and that the defendant had cooperated fully with everything he and the trial court had asked the defendant to do. On cross-examination, he acknowledged that the defendant's Sex Offender Risk Assessment stated that the defendant "presents a moderate risk to re-offend" and that "without appropriate supervision, boundaries that limit his access to potential victims, and specific sex offender treatment to address his sexual offending," the defendant would likely act out sexually in the future.

The defendant testified that he had not been charged with any other offenses. He said that Hollywood Video had decreased his work hours and that he was looking for another job. He said he was having difficulty obtaining employment, though, because he was a convicted felon and because he no longer could access the Internet and apply for jobs online. He said that Dr. Buckner was no longer counseling him but that he was being counseled by William Daniel. He said that he had no problems complying with his appeal bond requirements and acknowledged that he could follow any rules imposed by the trial court or his probation officer. On cross-examination, the defendant acknowledged that he worked with Cassie Heatherly at Hollywood Video and that he mowed Mrs. Heatherly's neighbor's yard. He also acknowledged that Mrs. Heatherly wrote a letter to his probation officer in which she stated that the defendant had been alone with her eleven-year-old daughter several times while he was mowing the neighbor's grass. He said that he had had no unsupervised contact with any children and that Mrs. Heatherly always was present when he was with her daughter.

The trial court noted that although Dr. Buckner believed the defendant had a minimum likelihood of reoffending, the defendant's Sex Offender Risk Assessment characterized his risk to reoffend as moderate. Thus, the trial court held that the defendant's rehabilitation prognosis was guarded. The trial court noted that the defendant's work toward rehabilitation had been good and that he had followed all of the conditions of his bond. However, it still determined that a lack of confinement would depreciate the seriousness of the offenses and ordered that the defendant serve six months in confinement and the remainder of his effective six-year sentence on supervised probation.

The defendant appeals, claiming that the trial court should have granted his request for full probation. He contends that the trial court erred by determining that his likelihood for rehabilitation was guarded because he has no prior criminal record, had committed no subsequent offenses, had

complied fully with his appeal bond requirements, was receiving counseling, had maintained steady employment, and had passed two polygraph tests. In addition, he argues that the trial court should not have denied his request for full probation based upon the need to avoid depreciating the seriousness of the offenses because the circumstances of the offenses were not "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" as required by State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991). The state argues that trial court properly resentenced the defendant. We agree with the state.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). However, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When determining if incarceration is appropriate, a trial court should consider whether (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is needed to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) less restrictive measures than confinement have frequently or recently been applied unsuccessfully to the defendant. Ashby, 823 S.W.2d at 169 (citing T.C.A. § 40-35-103(1)(A)-(C)). The trial court may also consider the mitigating and enhancing factors set forth in T.C.A. §§ 40-35-113 and -114. T.C.A. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). In addition, a trial court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); Boston, 938 S.W.2d at 438. In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168.

In order for a trial court to deny alternative sentencing based upon a need to avoid depreciating the seriousness of the offense, the "circumstances of the offense 'as committed, must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring probation.'" State v. Fields, 40 S.W.3d 435, 441 (Tenn. 2001) (quoting State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985) (quoting State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981)), overruled on other

grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000)); Hartley, 818 S.W.2d at 374-75. In this case, the trial court determined at the defendant's first sentencing hearing that incarceration was warranted because the defendant repeatedly accessed child pornography for over one and one-half years and accessed it so frequently that he was one of the top twenty-five people to use Landslide in Tennessee. During the defendant's second sentencing hearing, the trial court held that those facts still warranted a period of confinement. We agree that some confinement is appropriate to emphasize to this defendant the seriousness of his actions. See State v. Butler, 880 S.W.2d 395, 401 (Tenn. Crim. App. 1994) (holding that the circumstances of the offense did not justify a sentence of full confinement but did warrant some confinement to avoid depreciating the seriousness of the offense). The proof shows that the defendant repeatedly viewed child pornography over the Internet and frequently downloaded the pornographic images onto his computer. Although he was disgusted with his behavior, the defendant failed to get any treatment for his addiction until the police stopped him in the post office parking lot. We hold that the defendant's criminal conduct justifies six months in confinement to avoid depreciating the seriousness of the offenses.

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE