IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 27, 2011 Session

## STATE OF TENNESSEE v. JAMES LEROY POSTON

**Direct Appeal from the Criminal Court for Cumberland County**
**No. 08-0188    David A. Patterson, Judge**

_____

**No. E2011-00106-CCA-R3-CD - Filed March 5, 2012**

_____

The Defendant-Appellant, James Leroy Poston, was indicted by the Cumberland County Grand Jury for one count of second degree murder. Poston subsequently entered a guilty plea to reckless homicide in the Cumberland County Criminal Court. Pursuant to his plea agreement, Poston received a sentence of two years as a Range I, standard offender, with the manner of service to be determined by the trial court. At the sentencing hearing, the trial court imposed a sentence of confinement in the Tennessee Department of Correction. On appeal, Poston argues that the trial court erred in denying his request for an alternative sentence. Upon review, we reverse the judgment of the trial court and remand for entry of a judgment sentencing Poston to serve his two-year sentence on supervised probation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

C. Douglas Fields, Crossville, Tennessee, for the Defendant-Appellant, James Leroy Poston.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Randall A. York, District Attorney General; and Gary McKenzie, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Plea Submission Hearing.** Prior to Poston entering his guilty plea, the State summarized the facts that formed the basis for the plea agreement:

Judge, [on] April 24, 2008, the Tennessee Bureau of Investigation was called out to investigate a homicide that occurred here in Cumberland County. And the facts [upon which] the state would rely . . . if we went to trial [are that] after interviewing several witnesses, the [Tennessee Bureau of Investigation] had one . . . witness who was the . . . girlfriend, fiancee of the . . . victim[, Jimmy Dion Conatser,] at the time[.] And her statement was that the defendant had gotten into an argument with the victim . . . and that the victim . . . had r[u]n outside of the home and was out in the yard when the defendant . . . shot and killed him standing in the yard.

So that was [the scenario in which] Mr. Poston did shoot and kill [the victim] . . . where [the victim] was nowhere near or around him.

Now that's the state's contention, that's what we believe. However, having said that, the difficulty that the state faces [is that o]ur proof is . . . limited to a single witness. And we understand that the defense would attack that witness based on . . . her history as well as . . . her relationship with the victim at the time.

The defendant would testify at trial . . . that there was an altercation, that the victim was the aggressor in that altercation, that the defendant was in fear of his life[,] and that he . . . shot and killed the victim in some form of self-defense.

The difficulty the state [has] is that there was blood found on the porch area and in the immediate vicinity of the home that, if the blood was the victim's, which is very likely . . . , would corroborate what the defendant says. The defendant also says . . . the victim tried to strike him with a two by four [board,] and there was [a board] found on that porch . . . that [is] consistent [with Poston's version of the events]. So there's some dispute as to what took place and what happened between these individuals.

Likewise, the victim's prior criminal history would [probably be admissible] . . . to show [that the victim is] the first aggressor. And the defense and I have had plenty of conversations about this[,] and [the victim had] prior assaultive[-]type convictions[,] and in fact the victim had just recently got[ten] out of prison.

All of these things, and also taking into consideration . . . the defendant's health and how he would appear at trial, puts the state at a disadvantage somewhat [in getting] the second degree [murder] conviction.

[This has all] led to our . . . negotiated plea today for reckless homicide. I don't know that anybody is happy with this, but given the factual circumstances and the evidence and the risk [of] going to trial for the defendant, we think this is an appropriate settlement.

**Sentencing Hearing.** Chad McCaleb, an employee with the Tennessee Department of Probation and Parole, testified that he prepared Poston's presentence investigation report, which was entered into evidence. This report established that Poston was a seventy-six-year-old white male with no criminal history. The report also stated that Poston had a third grade education, was married but separated from his wife, Wanda Poston, and lived with his son and daughter-in-law prior to his incarceration for this offense. In the report, Poston reported poor mental health because he could not "remember things half the time." He also stated that he was in poor physical health, had problems with his back, legs, heart, and eyes, took multiple medications, and received disability benefits. McCaleb then read Wanda Poston's victim impact statement from the presentence report, in which she stated that "this incident [in which her husband fatally shot her son[1]] nearly killed her" and that despite the fact that she had "hoped for more than a . . . two[-]year sentence," it was her desire that Poston serve his entire sentence in confinement.

Tommy Calahan, an agent with the Tennessee Bureau of Investigation, testified that he was the lead investigator in Poston's case. Upon arriving at the scene of the incident, Agent Calahan obtained consent from Poston to search his home. During this search, Agent Calahan discovered a revolver in Poston's chair, and Poston told him that the gun was his and that he had retrieved it from his bedroom during an argument with the victim. Poston also informed Agent Calahan that the victim had been drinking, had thrown a chair and a wooden board at him, and had called him a "son of a b----." Finally, Poston told Agent Calahan that he fired two warning shots before firing the third fatal shot at the victim. Agent Calahan said that statements were also obtained from Poston's wife and Tamara Underwood, the victim's girlfriend. He said that Underwood claimed she and the victim were about to get into their car to leave Poston's home when Poston retrieved his gun, walked to the front porch, and shot the victim, who was approximately twenty to twenty-five feet away. However, Agent Calahan said Wanda Poston offered a different version of the incident. Mrs. Poston said that Poston and the victim began arguing because Poston would not allow the victim to use the lawnmower while intoxicated. Mrs. Poston said that the victim and Underwood walked out

_____

[1]The victim in this case is the Defendant-Appellant's stepson.

to their car, while Poston stayed inside the house. Poston and the victim continued to yell at each other, and then Poston came outside with a gun in his hand. She also stated that Poston fired a shot at the victim and that the victim threw two wooden boards at Poston, although she was unsure about the sequence of these events. Agent Calahan stated that the victim had a criminal history that included charges for attempted methamphetamine distribution and a 1995 assault. He acknowledged that Poston immediately admitted that he was responsible for the shooting. Agent Calahan also said that he observed blood drops on Poston's front porch that extended twenty-five feet to the location of the victim's body, which indicated that the victim had been shot while he was standing on the front porch. Agent Calahan said that a chair was found at the scene, a wooden board was found on the front porch, and a second wooden board was found in Poston's living room. During the sentencing hearing, the parties stipulated that the victim had a blood alcohol level of .10 percent at the time of the offense.

Monica Arroyo, the victim's cousin, read a statement during the sentencing hearing. In it, she stated that Poston had taken away a loved one from her and her family. Arroyo challenged Poston's use in court of a wheelchair and an oxygen ventilator by asserting that Poston typically did not need a wheelchair or ventilator. She asked that the court give Poston the harshest sentence possible.

James Richard ("Ricky") Poston, testified that his father, the Defendant-Appellant, had been a good father to him. He also stated that the victim was his step-brother and that he and his step-brother were adults when their parents married. Ricky Poston said that he loved his step-brother, the victim. He also said that his father began living with him after the shooting because his father needed assistance going to his doctors appointments and obtaining his prescriptions. He acknowledged that the victim was physically very strong. He said that his father had shown signs of remorse and regret after the shooting and that he often saw his father crying at the kitchen table at night.

The Defendant-Appellant, James Leroy Poston, testified that he suffered bruises to his right arm and right leg when the victim hit him with a wooden board during the incident. Pictures of these bruises were entered into evidence. Poston then made the following statement to the court:

> . . . I'd like to apologize to all of the family. I know I caused a lot of trouble. And I loved [the victim], I did, there ain't [sic] no lie about it. If I hadn't of [sic] loved him, I wouldn't have [taken] care of him as long as I did, twenty something years. I [did] all I could do[,] and I [gave] him the money to pay . . . his light bill and [to] get his driver[']s license. . . . And it's, it's just

-4-

been hard on us, I think I've suffered. I don't sleep at night, I don't sleep at night. I walk the floors.

Poston said he would be seventy-seven years old within the month and asserted he was in terrible health. He stated he shot the victim because the victim "started it all." He also said he was frightened of the victim. Poston said he was sorry the shooting occurred.

During cross-examination, Poston acknowledged he became angry enough to get his gun when the victim called him a "son of a b----[.]" He said he was sitting in his chair, and the victim was sitting in his car outside, when the victim made this offensive statement to him. In response, Poston retrieved his .38 caliber handgun and walked out on the porch, and the victim threw a chair at him, which caused Poston to fall down. As he was on the ground, Poston began firing the gun. Poston also admitted he was normally able to walk but was sitting in a wheelchair because of a recent fall. He acknowledged he should receive some punishment because he took the victim's life.

During the sentencing hearing, defense counsel informed the court that he and the State had agreed to have letters from Poston's doctor and a list of his medications admitted as a summary of Poston's health conditions. In these letters, Poston's doctor asserted that Poston suffered from severe cardiovascular disease that required an artery bypass graft in 2006 and two cardiac stents. In addition, she said that Poston has had "progressive problems[,]" including the risk of bowel rupture, from his colostomy and bowel stent. The doctor said that she discussed the possibility of hospice care for Poston's long-term care. She also said he suffered from stage three chronic kidney disease, congestive heart failure, rectal bleeding, lung problems, and atrial fibrillation. Poston's doctor opined that Poston was "an extremely high risk case that would require close monitoring by physicians, lab[s], and possible imaging." She also opined that a discontinuation of his approximately thirty medications would result in "certain death." Although the State agreed to the admission of the doctor's statement and records, it argued that nothing in these documents made Poston an inappropriate candidate for the Special Needs prison.

Prior to determining the manner of service of the two-year sentence, the trial court considered all of the information in section 40-35-210(b), including the evidence from the sentencing hearing, the presentence investigation report, the victim impact statement, the principles of the sentencing act, the arguments regarding sentencing alternatives, the nature and characteristics of the criminal conduct involved in the case, the initial charge of second degree murder, and the applicable enhancement and mitigating factors. It also considered the victim's blood alcohol level of .10 percent, the victim's prior criminal history, and Poston's decision to retrieve a gun after the victim called him a "son of a b----." The court also noted that the defendant had the burden of establishing his suitability for full probation

and had to show that probation would serve the best interest of the public and the defendant.

The court also stated that Poston "deliberated" before committing the offense in this case. However, it acknowledged that Poston could have made a self-defense claim had the case gone to trial, especially given the fact that the victim was intoxicated and allegedly hit Poston with a wooden board during the incident. Ultimately, the trial court found that "[c]onfinement [was] necessary to avoid depreciating the seriousness of the offense or confinement [was] particularly suited to provide an effective deterrence to others likely to commit similar offenses."

At the conclusion of the sentencing hearing, the trial court denied all forms of alternative sentencing and determined that Poston would serve his two-year sentence in the Tennessee Department of Correction. Poston filed a timely notice of appeal.

**ANALYSIS**

Poston argues that the trial court erred in denying him an alternative sentence. Although Poston initially contends that he was entitled to a statutory presumption that he was a favorable candidate for alternative sentencing, he acknowledges in his reply brief that he should only be considered a favorable candidate for alternative sentencing under the current law. He also acknowledges that he bears the burden of proving his suitability for full probation and contends that he has satisfied this burden. Pursuant to the factors in State v. Blackhurst, 70 S.W.3d 88, 97 (Tenn. Crim. App. 2001), he argues that he has met his burden of proving that he is a good candidate for full probation because he has no criminal history, has been married for the past twenty-three years, has mild dementia, is currently disabled, has debilitating physical health problems, has expressed remorse and accepted responsibility for his crime, has fully cooperated with law enforcement, owns his own home, has family that will take care of him as needed, has no history of drug or alcohol use, has a good reputation in the community, had a consistent work history prior to becoming disabled, and was a good father and loved the victim. Poston also argues that a probationary sentence will serve the ends of justice and the best interest of both the public and the defendant. He claims that the public's interest weighs in favor of a probationary sentence because he has no criminal history and little likelihood of re-offending. Moreover, he argues that his interest weighs in favor of a probationary sentence because "[i]ncarceration runs the risk of so disrupting his continued health care [that] he could die" and "[t]here is nothing to suggest that incarceration is necessary to impress upon him the gravity of his actions." Finally, Poston contends that the nature of the offense does not support the application of Tennessee Code Annotated section 40-35-103(1)(B).

In response, the State contends that although Poston's offense classification and range established his eligibility for an alternative sentence, he failed to satisfy his burden of proving he was a suitable candidate for full probation. The State also argues that the trial court properly determined that confinement was necessary to avoid depreciating the seriousness of the offense pursuant to Tennessee Code Annotated section 40-35-103(1)(B). Upon review, we disagree with the State and conclude that the two-year sentence of confinement was improper in this particular case.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d), Sentencing Comm'n Comments. Because the trial court improperly applied section 40-35-103(1)(B) in imposing a sentence of confinement, our review is de novo without a presumption of correctness.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). A trial court, when sentencing a defendant or determining an alternative sentence, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007).

Tennessee Code Annotated section 40-35-102(5) (2006) gives courts guidance about the types of defendants who should be required to serve their sentences in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Poston argues that he is a favorable candidate for alternative sentencing. Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). T.C.A. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" that would prevent an individual from receiving alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); Ashby, 823 S.W.2d at 169.

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477

(Tenn. Crim. App. 1996). Where a defendant is considered a favorable candidate for alternative sentencing, the State has the burden of presenting evidence to the contrary. State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, the defendant has the burden of establishing his suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. Id. (citing T.C.A. § 40-35-303(b)).

Here, Poston was eligible for probation because his sentence was ten years or less and the offense for which he was sentenced was not specifically excluded by statute. T.C.A. § 40-35-303(a) (2006). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). Accordingly, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Comments. Instead, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285 (Tenn. 1978)); see also Blackhurst, 70 S.W.3d at 97. The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. T.C.A. § 40-35-103(5). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5).

In this case, Poston agreed to a two-year sentence pursuant to his plea agreement. The record shows that Poston fatally shot his adult step-son during an argument. Here, the trial court, in imposing a sentence of total confinement, relied on section 40-35-103(1)(B), that is, that "[c]onfinement [was] necessary to avoid depreciating the seriousness of the offense or confinement [was] particularly suited to provide an effective deterrence to others likely to commit similar offenses." A review of the record shows that no proof was presented at the sentencing hearing regarding the need to deter others from committing similar offenses

pursuant to section 40-35-103(1)(B). See State v. Nunley, 22 S.W.3d 282, 286 (Tenn. Crim. App. 1999) (holding that in order to use deterrence as a justification for confinement, evidence must be presented indicating some special need for deterrence in that jurisdiction). Accordingly, deterrence is an inappropriate justification for the imposition of a sentence of confinement in this case.

We must next consider whether confinement was justified based on the need to avoid depreciating the seriousness of the offense. It is well established that an alternative sentence may be denied based on the nature or circumstances of the offense where "the criminal act, as committed, would be described as especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree; and . . . the nature of the offense, as committed, outweighed all other factors" favoring an alternative sentence. State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981); State v. Bottoms, 87 S.W.3d 95, 103 (Tenn. Crim. App. 2001); State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991). Therefore, an alternative sentence may be denied pursuant to section 40-35-103(1)(B) where confinement is necessary to avoid depreciating the seriousness of the offense because the offense meets the Travis prerequisites. Upon de novo review without a presumption of correctness, we conclude an alternative sentence is appropriate in Poston's case because the nature of the offense, although tragic, did not outweigh all other factors favoring an alternative sentence. We also conclude that the record does not support the trial court's implicit determination that Poston failed to satisfy his burden of establishing that he is a suitable candidate for full probation. See T.C.A. § 40-35-303(b).

Viewing the record as a whole, we give weight to the fact that Poston has no criminal history, is physically disabled, has significant health problems that require him to be regularly seen by doctors and treated with approximately thirty prescriptions, has dementia, has expressed remorse for his crime, has fully cooperated with law enforcement, has supportive family members who help take care of him, has no history of drug or alcohol use, and had a consistent work history prior to becoming disabled. We note that, if a defendant is "of ill health and requires constant medical attention[,]" this may be a factor in favor of alternative sentencing. State v. Thomas L. Matthews, No. 02C01-9704-CR-00158, 1998 WL 148317, at *3 (Tenn. Crim. App., at Jackson, Mar. 31, 1998) (citing Ashby, 823 S.W.2d at 170), perm. app. denied, (Tenn. Dec. 28, 1998). In addition, we note that a defendant's claim of innocence or self-defense should be considered by the trial court at sentencing. See State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995) ("[A] defendant [in a capital case] has the right to present at the sentencing hearing, whether by the jury which heard the guilt phase or by a jury on resentencing, evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability."). Most importantly, we give great weight to the fact that Poston is a good candidate for rehabilitation. After reviewing these factors, we conclude that the trial court's decision to

impose a sentence of total incarceration is not supported by the record. See State v. Ballard Eugene Anderson, No. 03C01-9902-CR-00084, 2000 WL 122218, at *8 (Tenn. Crim. App., at Knoxville, Jan. 26, 2000) (modifying the defendant's four-year sentence of confinement to a two-year sentence to be served on supervised probation where the court concluded that neither the circumstances of the offense nor the need to deter others from committing a similar crime applied). Therefore, we sentence Poston to serve his two-year sentence on supervised probation.

## CONCLUSION

Upon review, we reverse the judgment of the trial court and remand the case for entry of a judgment sentencing Poston to serve his two-year sentence on supervised probation.

_____
CAMILLE R. McMULLEN, JUDGE