STATE of Tennessee, Plaintiff-Appellee,

v.

William Dale TRAVIS,
Defendant-Appellant.

Supreme Court of Tennessee.

Oct. 19, 1981.

P. Douglas Morrison, Thomas H. Dickenson, Knoxville, for defendant-appellant.

William M. Leech, Jr., Atty. Gen., William P. Sizer, Asst. Atty. Gen., Nashville, Ronald A. Webster, Dist. Atty. Gen., Russ Dedrick, Asst. Dist. Atty. Gen., Herbert S. Moncier, Sp. Prosecutor, Knoxville, for plaintiff-appellee.

## OPINION

DROWOTA, Justice.

In this case we are called upon to determine whether or not the trial court was in error in denying probation to defendant William Dale Travis, who pled guilty to the offense of involuntary manslaughter; and whether the Court of Criminal Appeals was correct in reversing such order of denial and ordering probation. As explained herein, we modify the latter order and remand to the trial court.

On the night of April 15–16, 1978, Travis, a close friend, and two young ladies whom they were escorting that evening, were traveling west on Kingston Pike in Knoxville in defendant's 1975 Pontiac Trans Am automobile. They had been attending a party, and Travis had consumed two, perhaps three, drinks of alcohol during the previous few hours. The alcohol content of his blood was measured later that night at .01%.

Suddenly, the car went out of control, striking the right curb, moving along it for some distance, crossing diagonally to the opposite side of the street, striking a tree some eight feet above ground level, and coming to rest beyond the tree. Although there was testimony that Travis was traveling at some 80–90 miles per hour, it was stipulated that an expert would have testified that he was traveling at a speed of at least 65 miles per hour, slowing to 45 by the time he hit the tree. The speed limit on Kingston Pike was 45 m. p. h. Defendant was unable to recall the accident. He was injured and all of the passengers were killed.

In September, 1978, Travis was indicted for involuntary manslaughter, and on February 26, 1979, he pled guilty to that offense in open court. Thus, defendant's guilty plea was not to a reduced charge. The State recommended a sentence of one to four years in the State Penitentiary. The court was then notified that Travis would seek a suspended sentence, in response to which the court informed Travis that a presentence investigation would be made in order to determine what kind of citizen he had been, and that the court put considerable emphasis on the nature of the case, so that probation was more difficult to come by when the death of another was caused by criminal conduct.

The presentence report was entirely favorable to Travis, and unreservedly recommended probation. The report made it clear that Travis deeply regretted what he had done and accepted responsibility. The counselor had talked with several references, including a source whom the prosecution had recommended she talk with. All sources, including that one, "recommended strict supervision on probation as opposed to serving a penitentiary sentence." The report concluded that "Travis appears to be a very good candidate for probation. It is respectfully recommended that probation be granted in this case."

Attached to the report was a statement from a psychiatrist with whom Travis and his parents had had a session several weeks after the accident. This pointed to his remorse and sense of responsibility, and to the fact that the entire family felt the same way. The doctor felt that the family would be able to work through their grief because they had a close relationship and were trying to make the adjustment.

At the probation hearing, a wealth of evidence was brought out. A summary follows:

Travis testified to the fact that he had been working for his father since the age of thirteen and was largely self-supporting. His family was very close-knit. He had also been very close to the boy who had been killed in the accident. He was unable to recall the accident, so did not know why the car had been speeding or went out of control. He stated that he did not need to be punished by a jail sentence, as he was already punishing himself from within; as to rehabilitation, he wished to pick up his life and live constructively; and he did not need to serve a sentence as a deterrent, because he would never drive too fast again. He responded to rumors of a callous attitude by describing the extent of his suffering. He stated that he would gladly trade places with any of the victims if that could serve any purpose. He admitted that he had had an automobile accident on February 21, 1976, after turning sixteen the previous October; that on October 28, 1976, he had been charged with speeding; that on January 24, 1977, the State had sent him a warning letter; that on March 21, 1977, he had had a "fender bender," turning left after waiting for traffic to clear, not seeing a car which he hit in the rear; and that on September 15, 1977, he had been cited for

speeding. His Trans Am and a small boat which he owned were not "souped up" or adapted for racing.

Mr. and Mrs. Travis testified that their son had always been around adults a great deal; that they were very close, had always spent their spare as well as business time with their children (Dale and a younger daughter); that they had always been proud of his conduct; that he had deeply affected by the accident; that they had always believed in young peoples' working and earning money in order to acquire a proper sense of values; that no more punishment was needed; and that prison would not serve the purpose of rehabilitating their son.

Judge Roland Prince, from Oak Ridge, stated that he had requested to testify in behalf of Travis. He had seen Travis several times a week over the last ten years; he had never seen improper conduct; Travis had always acted like an adult, handling cars and boats responsibly. Accidents can happen to anyone, everyone has moments of carelessness. A penitentiary sentence would be inappropriate; he felt that Travis was a perfect candidate for probation, based upon his experience as a judge who had made similar decisions many times. Any deterrent effect of the accident upon the general public had already been had.

Kenneth L. Carter was senior minister of the Travis family's church, had done his doctoral dissertation on grief and its effects on people and had been involved with the county and state prison systems organizing assistance to inmates, families and victims. He had access to records and procedures of the Department of Corrections. Further, he had counselled the whole Travis family as well as the family of one of the victims. Travis had always accepted full responsibility and was deeply remorseful. For his benefit and society's, no purpose could be served by incarceration. He stated that he was a realist and knew that prisons are necessary. However, lives can be wrecked in prison. He did not minimize the tragedy, but destroying Dale's life would only compound the tragedy. Dale's causing the oth-

er three to die increased his own duty to contribute to society. As to suitable punishment, Travis had said that he would like to try to convince others that this sort of tragedy can happen to anyone. He could be useful in talking to young people.

Others, including the President of the Knoxville *News-Sentinel*, a fellow employee at Mr. Travis' business, another businessman, and individuals who wrote letters, stated that Travis was a fine, responsible, courteous person, a hard worker, etc. These people had observed Travis in all situations around adults and around his peers. He was careful in his handling of automobiles and boats. He had come through his youth without difficulty in troubled social times.

The parents of Travis' friend who had died in the wreck described the boys' relationship. The mother described an incident where the boys had told her that they had the opportunity to drive to Florida with some friends, but they were going to take a separate car because they felt the friends were going to drive fast. Prison was not necessary for punishment, rehabilitation or deterrence. One of the four lives in question could be salvaged if Travis were not sent to prison. Prison would have no redeeming effect on Travis or the community. He was not a detriment to society. The court could trust him, if probation were granted, not to be a burden to society. Travis had come to see them, talked for several hours, and expressed much sorrow.

The State put on no proof in opposition to probation for Travis. The opposition came from the parents of one of the girls killed. Her father described what a fine Christian person she had been, with many friends of all ages and hopes for a career serving others. The father felt that a crime had been committed and punishment should be served.

The trial court made an explicit statement at the conclusion of the hearing, giving his reasons for denying probation. The judge mentioned some of the factors weighing in Travis' favor, such as his work history, his family background, his remorse, his

acceptance of responsibility. He pointed out that he had to consider what was best for society as well as for the defendant. The court also made lengthy references to the factors which he considered militated against probation. These can be broken down as follows:

1. The use of alcohol prior to the accident. The judge felt that this case was similar to many others where young people from the University "fueled up their enthusiasm," which had an "almost explosive-like effect."

2. The deterrent effect of punishment. He felt that deterrence was an important and a "needed" factor and that the law of Tennessee so recognizes.

3. The therapeutic effect of punishment. Payment of the debt which society had fixed would be of benefit to the defendant; defendant would come out stronger.

4. A previous unfortunate experience after granting probation. Another young man with a similar background and much chance for success in life had killed himself after his sentence had been suspended.

5. The nature of the offense. The court considered Travis' acts gross, wanton and reckless, and noted that other cars could easily have been involved.

■ It was clearly improper for the trial judge to consider the use of alcohol as a factor against probation. The record shows, without contradiction, that Travis' blood alcohol content some two hours after the accident was .0101%. T.C.A. § 55–10–408(b) provides that an alcohol content of .10% creates a presumption that defendant was under the influence, and that his ability to drive was impaired thereby. However, under § 55–10–408(a), a content of .05% or less shall create no presumption. Since Travis' blood alcohol content was much less than this, alcohol could not, as a matter of law, have been a causative factor and could not weigh against granting probation.

■ In this case it was also improper to consider deterrence as a factor. We held in *Moten v. State*, 559 S.W.2d 770 (Tenn.1977)

that deterrence was not mentioned in our statute pertaining to probation, T.C.A. § 40–2904. Such statute was amended by the Legislature so as to add deterrence, effective May 5, 1978. We held in *Boykins v. State*, 584 S.W.2d 194 (Tenn.1979) that to consider deterrence, where the underlying offense was committed prior to the effective date of the amendment, "would amount to prohibited ex post facto legislation." *Id.* at 196. Since the accident in the case at bar took place on April 16, 1978, *Boykins* prohibits reliance upon deterrence to justify denial of probation. At any rate, it is not shown that deterrence is more than a theoretical factor here.

■ Neither can the therapeutic effect of punishment justify denying probation. It is not expressly or impliedly included within the language of T.C.A. § 40–2904, setting forth the factors governing probation. Finally, probation cannot be denied here because another young man committed suicide after the same judge suspended his sentence. With all due respect to the good faith and sincere concern of the learned trial judge, each case must be considered on its own facts and merits. The fate of Dale Travis must be decided in view of the evidence contained in the record as to his suitability for probation. *See State v. Watkins*, 607 S.W.2d 486, 488 (Tenn.Cr.App. 1980).

■ The only remaining factor given consideration by the trial court in denying Travis a suspended sentence was the nature and circumstances of the offense itself. Therefore, we shall review the consideration and weight which may be given this factor. The landmark case in Tennessee on the subject is *Stiller v. State*, 516 S.W.2d 617 (Tenn.1974). Therein, a bank president was convicted of forging bank notes, embezzlement, and making false entries showing fictitious loans. He pled guilty, made restitution, was fined and convicted in federal court, incurred a large additional federal tax liability, had obtained a new job, and had suffered and caused his family to suffer disgrace and embarrassment. The trial

judge granted probation, feeling that despite such a deliberate and reprehensible act on Stiller's part, he showed evidence of rehabilitation potential. The State argued that probation was on abuse of discretion.

This court reviewed what a defendant is entitled to: the right to petition for probation, the right to a full and fair evidentiary hearing with all procedural requirements contained in or necessarily contemplated by the statutory scheme. 516 S.W.2d at 619–20. To be considered are the circumstances of the offense, defendant's criminal record, his social history, his present condition and, where appropriate, his physical and mental condition. *Id.* at 620. If the judge grants probation, the terms shall be reasonable and realistic, and not so stringent as to be harsh, oppressive or palpably unjust. *Id.* The court commented that the theory of probation is that "it is in the public interest that those who violate society's rules of conduct should, in proper cases, be given an opportunity to rehabilitate themselves and to be restored to useful and productive citizenship. More and more our society is coming to realize that 'warehousing' criminals on an indiscriminate basis is financially, socially and morally unacceptable." *Id.*

The Court of Criminal Appeals had reversed the grant of probation, holding that the enormity of Stiller's crime precluded probation. We held that the enormity of the crime is a legitimate factor, but is only one among all of the factors listed above. Since the appellate courts did not have the probation report in the record, which presumably was wholly favorable to Stiller, we held that the trial judge had not abused his discretion in granting probation, in view of all of the favorable factors as opposed to the one negative factor of the crime itself.

In *Mattino v. State*, 539 S.W.2d 824 (Tenn.Cr.App.1976), defendant had burglarized an unoccupied residence. Obviously, this was a deliberate crime, but it was also an apparent aberration; further, he confessed and cooperated with investigators. The record contained recommendations "highly favorable to defendant," including one from his employer and one from the

director of probation services in New York (where defendant lived), who was personally acquainted with defendant. This party stated that he was certain Mattino had learned his lesson well. Further, the State did not oppose probation for Mattino, just as it did not in the present case. The appellate court found this to be "a neutral if not favorable factor" to Mattino, 539 S.W.2d at 827. Thus, the only factor on the basis of which the trial court could have denied probation was the nature of the crime itself. The *Stiller* case, *supra*, compelled the Court of Criminal Appeals to find that "the court's denial [of probation] on such a narrow basis may indeed constitute an abuse of discretion requiring reversal. . . ." *Id.* at 828. The nature of the crime must be considered along with all other relevant factors listed in *Stiller.* The nature of the crime might be the one controlling factor where it was a "[crime] of violence against the person, or particularly heinous"—the type of crime not likely to be perpetrated by persons with backgrounds similar to Mattino's. *Id.*

In *Mattino*, the court also took the opportunity to comment more fully on the benefits to be gained from probation. Among these are enormous cost benefits and a statistically high rate of success as a correctional technique. " 'Other things being equal, the odds are that a given defendant will learn how to live successfully in the general community if he is dealt with in that community rather than shipped off to the artificial and atypical environment of an institution of confinement.' " *Id.* at 830.

Again in *Franks v. State*, 543 S.W.2d 613 (Tenn.Cr.App.1976), the court found the nature of the offense too narrow a basis upon which to deny probation. There, defendant had sold drugs and admitted that she had also sold drugs on previous occasions. Other factors were basically favorable to her. The Legislature had, in T.C.A. § 40–2901, clearly shown its intention "that persons guilty of this very crime, of this nature and character are proper subjects for consideration for probation." 543 S.W.2d at 615. So long as the crime in question comes within

the definition of those which can be considered for probation, the Legislature has pretermitted denial thereof based on the offense itself. *See also State v. Barber*, 595 S.W.2d 809 (Tenn.1980), wherein defendant had been convicted of selling an ounce of marijuana to an undercover agent, and the court had denied probation. It was shown that he had sold the marijuana in order to support his family, as he had been out of work for over a year. Further, he had stopped selling shortly after the sale in question, even though he was not arrested until some twenty months thereafter. All other factors were in his favor. "In short, appellant is a proven, ideal prospect for probation." 595 S.W.2d at 811. We held that, " 'it is true that the legislature has proscribed the sale of marijuana. But it is equally true that the legislature has authorized the use of probation as a rehabilitative tool in such cases, regardless of how guilty the offender might be where the circumstances otherwise justify it.' " *Id.* at 810.

Based on the foregoing, we must reiterate the fact that if probation is to be denied because of the nature of the offense, it would have to be clear that the criminal act, as committed, would be described as especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree; and it would have to be clear that, therefore, the nature of the offense, as committed, outweighed all other factors delineated in *Stiller* and in the Code which might be favorable to a grant of probation.

There have been several cases wherein our appellate courts have properly upheld the denial of probation based upon the enormity of the crime. One was *State v. Welch*, 565 S.W.2d 492 (Tenn.1978), wherein several defendants were involved in an extensive marijuana growing and processing operation. The defendants had otherwise favorable histories, and had been allowed to plead guilty to a lesser charge than that on which they had originally been indicted. The trial court properly considered the *Stiller* factors, but found them to be outweighed by the "massive" nature of the marijuana organization.

In *Powers v. State*, 577 S.W.2d 684 (Tenn. Cr.App.1978), defendants were convicted, after pleading guilty, of improper disposition of a dead human body. The opinion contains a graphic description of the gruesome events which took place, and no one could doubt that this was the sort of crime for which denial of probation is justified.

In *Kilgore v. State*, 588 S.W.2d 567 (Tenn. Cr.App.1979), defendant was tried for first degree murder and convicted of voluntary manslaughter in a shotgun slaying committed at his home. The trial court found this to have been a crime of *personal violence.* The fact that defendant could have been found guilty of first or second degree murder seemed to be significant in justifying denial of probation. Under those circumstances, where death has been caused *at the hands of* the defendant, it was held that exceptional circumstances must be shown in order to support a grant of probation. There, "the record of his trial demonstrates callous and violent activity on his part which might well have resulted in a verdict of first or second degree murder, had the jury been less lenient." 588 S.W.2d at 568.

In *State v. Grear*, 568 S.W.2d 285 (Tenn. 1978), we also upheld the trial court's denial of probation. In that case, there were factors *outside* the nature of the offense, on which the trial court had expressly based its denial. Chief among these was the fact that as a juvenile, Grear had been convicted of assault and placed on a year's probation. Shortly after his probation terminated, he committed the burglary in question in the case. Such an additional factor, when no factors were *improperly* considered, was sufficient in our view to support the denial.

The offense on which probation was denied in *Woodson v. State*, 608 S.W.2d 591 (Tenn.Cr.App.1980), was an offering by a city detective to accept a bribe to "fix" a case then under investigation by the police department. The Court of Criminal Appeals affirmed because, although bribery was not intrinsically violent or heinous, it became so when the crime was *soliciting* a bribe, and it was committed by one who had

taken an oath not to violate the law. "[T]hese circumstances render the offense not only wicked and reprehensible, but grossly so." 608 S.W.2d at 594.

The case most similar to the one at bar is *Kilgore v. State, supra,* wherein defendant was tried for first degree murder but convicted of voluntary manslaughter as the result of a shotgun slaying. Voluntary manslaughter is defined in the same statute which governs involuntary manslaughter, the crime with which Travis was charged and to which he pled guilty: T.C.A. § 39–2409. This reads:

> *Manslaughter.*—Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act.

Yet there are important differences between the convictions in *Kilgore* and in the present case. In *Kilgore,* defendant was charged with a greater crime than that of which he was convicted. Here, Travis pled guilty to the same crime as that with which he was charged. Thus, there can be no lingering question as to the degree of intent on Travis' part. By definition, involuntary manslaughter involves the taking of human life; and it involves doing so in a culpable manner. By definition, the offense involves more than mere inattention or momentary carelessness; rather, it is such that defendant must or should have known that it might endanger life and that death would be the natural and probable result of such act. *Roe v. State,* 210 Tenn. 282, 358 S.W.2d 308 (1962). Thus, if Travis had not acted with this degree of culpability, the deaths would have been accidental and there would have been no crime charged.

However tragic the results of Travis' acts, and we certainly do not overlook the tragedy involved, it is nonetheless true that Travis as a matter of law did not act with any actual intent to harm his passengers. Thus, we cannot say that this was a violent or heinous crime such as could in and of itself preclude a grant of probation under our case law. We have found that the trial court placed heavy emphasis upon factors which as a matter of law were improper to consider. We therefore remand the case to the trial court for findings as to whether or not the involuntary manslaughter as committed by defendant William Dale Travis was of a nature sufficiently aggravated to outweigh the evidence presented on his behalf. We note, without comment, that upon denying probation, the trial court expressed its willingness to entertain a motion that Travis serve his jail sentence elsewhere than at the penitentiary.

Accordingly, the opinion of the Court of Criminal Appeals is modified and the case is remanded to the trial court for a further order not inconsistent with this opinion.

Modified and remanded.

HARBISON, C. J., and FONES, COOPER and BROCK, JJ., concur.