IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

**STATE OF TENNESSEE v. JAMES DEMOSS**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-1945     Monte Watkins, Judge**
_____

**No. M2019-01583-CCA-R3-CD**
_____

James Demoss, Defendant, pleaded guilty to one count of voluntary manslaughter and two counts of aggravated assault. Pursuant to the plea agreement, the manner of service of the effective fifteen-year sentence was to be determined by the trial court. Following a sentencing hearing, the trial court ordered Defendant's sentence to be served in the Tennessee Department of Correction. On appeal, Defendant claims that the trial court abused its discretion by sentencing him to serve his sentence in incarceration rather than granting an alternative sentence. Because the trial court failed to articulate adequate reasons for denying an eligible defendant an alternative sentence, the abuse of discretion standard with a presumption of reasonableness does not apply on appeal, and this court can either (1) conduct a de novo review to determine whether there is an adequate basis for denying an alternative sentence; or (2) remand for the trial court to consider the requisite factors in determining whether to grant an alternative sentence. We determine that the record on appeal is sufficient for this court to undertake a de novo review, and after a de novo review of the record and applicable law, we affirm the denial of an alternative sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

David M. Hopkins, Murfreesboro, Tennessee, for the appellant, James Demoss.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kristen Kyle-Castelli, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted by the Davidson County Grand Jury with one count of first degree premeditated murder, three counts of aggravated assault, one count of felony reckless endangerment, and one count of domestic assault. The offense date was June 5, 2016. Pursuant to a plea agreement, Defendant entered a best interest guilty plea to one count of voluntary manslaughter and two counts of aggravated assault with a sentence of ten years at sixty percent for voluntary manslaughter and sentences of five years at sixty percent for each aggravated assault. The aggravated assault sentences were to be served concurrently with each other but consecutively to the sentence for voluntary manslaughter, for an effective sentence of fifteen years at sixty percent, with the manner of service to be determined by the trial court following a sentencing hearing. The other counts were dismissed.

### *August 26, 2019 Sentencing Hearing*

Eric Patton testified that Lamar Alexander Thomas, the homicide victim, had been his best friend. Mr. Patton and Mr. Thomas were at the laundromat at the apartment complex where Mr. Patton's girlfriend, Jessica Brown, lived. Defendant and his wife, Destiny Demoss, had been staying at Ms. Brown's apartment. Mr. Patton received a text message from Ms. Brown asking him to come to her apartment. Mr. Thomas drove Mr. Patton to Ms. Brown's apartment, dropped him off, and returned to finish his laundry. When Mr. Patton entered the apartment, he saw Defendant holding a pistol. Mr. Patton said that Ms. Brown "was sitting in her chair with tears in her eyes like she was scared, and Ms. [Demoss] was sitting on the pull-out bed and she looked like she [had] been crying, and she looked like she had maybe like a bruise or two on her face." Mr. Patton questioned Defendant, who said that he was trying to get his stuff together so he could leave. Ms. Demoss tried to gather some items for Defendant, but Defendant began throwing the items. Defendant pointed his gun at Mr. Patton and at Ms. Demoss. He then pushed the television off the dresser and left the apartment.

Mr. Patton telephoned Mr. Thomas. He explained that Defendant had threatened them with a gun and told Mr. Thomas to be careful because Defendant was still outside. While Mr. Patton was on the phone with Mr. Thomas, Defendant knocked on the apartment door. Mr. Patton opened the door, and Defendant said that he was missing some of his property. Mr. Patton told Defendant, "[P]lease just leave, you should have everything, just please go and leave, just leave us alone, just get off the property. If there's anything else within the house, we'll go ahead and gather it together and just send it to you."

While Defendant was standing at the door talking to Mr. Patton, Mr. Thomas arrived armed with a rifle. Mr. Thomas pointed the rifle at Defendant and told him to leave. Defendant, Mr. Thomas, and Mr. Patton then walked down the steps toward the parking area. Defendant had placed a bag of his property in Ms. Brown's vehicle, and Mr. Thomas stated that he would get the bag for Defendant. Mr. Patton testified:

> It was basically at that time, once [Mr. Thomas] handed [Defendant] the bag, at that instant, [Defendant] grabbed like [the] front of [Mr. Thomas'] gun with one arm, aimed it down [and] with his other arm that he had the gun in, pointed it straight at [Mr. Thomas] and pulled the trigger.

Mr. Patton said that Mr. Thomas dropped the rifle and fell to the ground and that Defendant fired four more times while standing over Mr. Thomas. Defendant placed the bag on top of the car and looked at Mr. Patton. Mr. Patton ran upstairs toward the apartment. He told Ms. Demoss, who was standing at the top of the stairs, to "get inside and lock the door." He used Ms. Brown's cellphone to call 9-1-1.

On cross-examination, Mr. Patton stated that he did not know Mr. Thomas was a convicted felon who was not permitted to possess a weapon. Mr. Patton agreed that he knew that Defendant had been diagnosed with post-traumatic stress disorder (PTSD) after being discharged from the army. He said that Mr. Thomas "wasn't really threatening [Defendant], he was just basically telling him . . . get your stuff and leave."

Lakissicy Burks, Mr. Thomas' older sister, read a statement that had been prepared by their mother, Marshell Ruffier. Ms. Ruffier stated that, at the time Mr. Thomas was murdered, he had a three-year-old son, a twelve-day-old son, and an older daughter. Ms. Ruffier described the emotional and financial hardship that her family had endured since Mr. Thomas' death.

Ms. Burks also read a statement that she prepared. She explained how her "brother's unexpected death" impacted her life. She said that her mother was "drinking her pain away" and that "Mr. Thomas' daughter's life had "spiraled into drugs and alcohol abuse." She said that the family was "troubled at the fact that the person that stood over [Mr. Thomas], shooting him multiple times, [was] free and with his family and with his children, and whereas [her] brother, he'll never see his and we'll never see him."

Judy Brown, Defendant's mother, testified that Defendant had five children, ranging in age from six weeks to ten years. The children were in her custody at the time of the sentencing hearing. She said that she had previously obtained custody of the four older children but that she had given custody back to Defendant before he was charged in

this case. When Defendant was arrested and initially unable to post bail, she again obtained custody of the four children. Judy Brown said that Ms. Demoss was incarcerated when the youngest child was born, so she picked the child up at the hospital. She did not know where Ms. Demoss was at the time of the sentencing hearing. She said that Defendant served in the United States Army, deployed twice to Iraq, and was injured by an improvised explosive device (IED) during his second deployment. Defendant was awarded a Bronze Star and a Purple Heart. According to Judy Brown, Defendant changed a lot "mentally" after he returned from Iraq. She said Defendant was being treated at the Veterans Administration Hospital, was prescribed several medications, and was undergoing counseling. After Defendant made bail, he moved in with her and his children. She said that, if Defendant were granted probation, he could reside with her as long as necessary.

Defendant testified that he served as an intelligence analyst in the United States Army from 2003 to 2008. He said that he "was trained on how to properly defend [himself] in any situation on the LOAC, which is the Law of Armed Conflicts, and how to properly determine what is a threat and what is not a threat[.]" He explained:

> [B]ecause asymmetric warfare being based around you don't know wh[o] the actual combatant is, you have to go – be able to think on your toes I guess you would say, and it's a very, very strenuous situation when you don't know if this person means well or if this person means to hurt you.

Defendant stated that, during his two deployments to Iraq, he was under an incredible amount of stress and that he was diagnosed with PTSD while still in the United States Army. During his second deployment, he "was hit by an IED . . . what they call toxic imbedded fragmentation, which is shrapnel[,]" and he suffered a concussion from the explosion. He was awarded a Purple Heart due to his injury. As a result his disability from injuries he incurred during military service, he received monthly compensation totaling seventy percent of his previous military pay. He was released from service under the Wounded Warrior Transition Act in 2008 and received an honorable discharge with medical stipulation. He stated that he takes numerous prescribed medications.

Defendant said that he and Ms. Demoss were separated before the shooting but that he paid $1,300.00 to bail Ms. Demoss out of jail, and they went to stay with Ms. Brown in an attempt to reconcile. On the morning of the shooting, Defendant called Latasha Dalton and asked her to pick up his children from his mother's house and bring them to Ms. Brown's apartment. After Ms. Dalton arrived, Ms. Demoss and her four children, Ms. Brown, Bre Calloway, Ms. Dalton, and Defendant walked to a nearby park. Bre Calloway is the mother of Mr. Thomas' children. While the others remained at the park, Defendant returned to Ms. Brown's apartment to take a shower. Mr. Patton and Mr.

Thomas followed him to the apartment. Defendant stated that Mr. Thomas, whom he had only met one time previously, started talking "about shooting up that neighborhood" and selling narcotics. Defendant said that Mr. Thomas was carrying some type of automatic pistol that looked like "a Glock" although "[i]t could have been a BB gun."

After the other people returned from the park, Defendant said that Mr. Thomas started talking about robbing Ms. Dalton or Ms. Dalton's husband, who came by the apartment to give Ms. Dalton some money. Defendant said that, while Mr. Thomas was distracted, he was able to leave the apartment with Ms. Dalton, Ms. Demoss, and his children. Ms. Dalton drove them to his mother's house where they dropped off the children.

When Defendant returned to Ms. Brown's apartment later that night, he saw syringes that he thought contained heroin by the kitchen sink. He emptied the syringes and washed the contents down the drain. He said that Ms. Demoss became angry and started hitting him and that Ms. Brown and Ms. Demoss were yelling at him when Mr. Patton came into the apartment. Defendant said that Mr. Patton, who was much bigger than him, did not understand what was going on and was in an "aggressive state." Defendant said that he felt threatened, so he pulled out his pistol for his own protection. He said that he left the apartment and then tried unsuccessfully to find a ride to his mother's house. He said that he thought he left his phone in Ms. Brown's apartment, so he returned to get his phone. He said that he "just wanted to leave. [H]e wanted to get away from that situation. [He]didn't want to be a part of that."

Defendant said that, while he was at the door, he heard a loud noise and turned to see Mr. Thomas coming at the "high ready," which he said meant that the rifle was pointed at him. He described what happened next as follows:

> [Mr. Thomas is] basically like moving upwards in a[n] angle like that until he is able to draw a bead directly on my chest. He draws the bead directly on my chest, at which point in a[n] instantaneous reaction, I pull out 357, now we're having [a] [s]tandoff, and I say "please, please, please, please, just let me leave. Let me leave."

Defendant said that Mr. Thomas backed him down the stairway. He said that he was moving down the stairs in a "tactical" manner and that Mr. Thomas was "following [him] down with one M-130 pointed directly at [his]chest[.]" Defendant testified, "[T]he bead on it is clearly drawn directly on me, I know what that's going to do on impact, and he pursues me, he keeps pursuing me." He claimed that when he got to the parking lot and attempted to retrieve the bag from the car, Mr. Thomas "rushed [him] instantaneously, telling [him] he could not get the bag." Defendant said that he was

"scared to death" and that he "knew that at that point that the only way for [him] to survive that night . . . was to engage the target[.]" Defendant said that, after he shot Mr. Thomas, he "immediately ran about a hundred meters up until [he] s[aw] the first police officer arrive . . . and raised [his] hands."

On cross-examination, Defendant admitted that he was mad at Ms. Demoss at the time of the shooting because of her drug use and because, while he was incarcerated for DUI, "she abandoned [the] children at [his] mother's and took off to another state with another man who had an overdose."

Defendant stated that Ms. Dalton was his childhood friend and that he called her earlier on the day of the shooting and asked her to come over to his mother's house. He and Ms. Demoss rode with Ms. Dalton to return his children. Defendant admitted he went into his mother's house and got his pistol and that he had it when he returned to Ms. Brown's apartment. Defendant also admitted he knew that Ms. Dalton had told the detectives that, during the drive to his mother's house, Defendant "became so erratic and so angry[,] that [Ms. Dalton] offered Ms. Demoss and [their] children a place to stay that night[.]" After Ms. Dalton took Ms. Demoss and Defendant back to Ms. Brown's apartment, Defendant remained outside to smoke a cigarette. After Defendant entered the apartment, the incident occurred which resulted in Ms. Brown texting Mr. Patton and asking him to come to her apartment. Defendant denied that Ms. Demoss told him not to come back to Ms. Brown's apartment.

Defendant claimed that, when he returned to Ms. Brown's apartment, Ms. Demoss attacked him after he emptied the syringes. He said that Ms. Demoss weighed approximately twenty pounds less than him. He described the injuries he sustained in Ms. Demoss's assault as follows: "In my face, all over. If you look at like, I mean, like, I was pretty beat up, I ain't gonna lie, I felt like I was hurt." When asked about the marks on Ms. Demoss's neck and Ms. Demoss's broken necklace, he said that he "was not trying to hurt her." He admitted that Ms. Brown and Ms. Demoss both asked him to leave the apartment. He said that he tried to leave, but the door was blocked. He stated that he "was trying to pack [his] bags and leave, [and that he] just wanted to grab [his] backpack and walk out that door[.]" He said that he drew his pistol because he was scared of Mr. Patton and because he was outnumbered. He admitted he was standing by the door when he knocked the television off the dresser.

Defendant admitted that he was drinking on the night of the shooting and that he had taken Xanax. He admitted that, after he was released on bail in this case, he tested positive for amphetamine at a drug screen performed at his August 9, 2019 court

appearance. He denied that his probation officer telephoned him on August 21, 22, and 23 and told him to come in for a drug test. He said that he only talked to her on Friday afternoon and that he "was unable to get in there" because he could not get a ride. During cross-examination, the following dialogue occurred regarding Defendant's drug use after he was released on bail in this case:

Q. What drugs have you been taking since June 5, 2016, since you were released from custody?

A. What narcotics have I taken since released from custody?

Q. That are not prescribed to you?

A. That are not prescribed to me. It has been a few. Now, by name, now from what I've seen in society, like one day in here you mentioned heroin, like me having a heroin problem.

Q. I'm asking you right now, what drugs have you consumed illegally that were not prescribed to you since you were released from custody at [the] Davidson County Sheriff's Office, I'm not asking about societal things or anything else, what drugs have you taken illegally?

A. I would say maybe amphetamine.

Q. Okay. Because you tested positive for that one in this very courtroom?

A. Yes.

Defendant admitted that he was convicted in Williamson County of driving under the influence (DUI), second offense on January 19, 2016, and was on probation for that offense at the time he killed Mr. Thomas. He stated that his probation was revoked as a result of the charges in this case and that he was incarcerated in Williamson County. He also admitted that he was on probation for a September 10, 2015 DUI in Maury County when he was charged with a second offense DUI in Williamson County. Defendant said, "There w[ere] multiple DUIs that occurred all within a short span of one another and they were all having to do with medications from the Veterans Administration or from something along those lines." He also admitted that he was convicted in 2013 of being in possession of a weapon while under the influence. He said that the weapon was actually Ms. Demoss's but that he "took the charge" for her because he "believed it's the man's responsibility." He admitted to being involved in a fight while incarcerated but

explained he had no other choice. He could not remember if he threw the first punch. He acknowledged making "numerous phone calls" from jail in which he was angry with his mother "for not being able to [secure his] bond." He agreed that his mother was caring for his four children at the time of the calls.

The State introduced the Tennessee Department of Correction Presentence Report (the presentence report) as Exhibit 1. The presentence report included the Metropolitan Nashville Police Department's homicide summary report, which stated that the police were called to the scene of a shooting on June 5, 2016 at about 11:40 p.m. Mr. Thomas "was transported to Vanderbilt where he was pronounced deceased upon his arrival." Defendant "was taken into custody at the scene without incident." Defendant and Ms. Demoss had been staying at Ms. Brown's apartment. "[Defendant] was at the apartment just prior to the shooting where he assaulted his wife and two others." Defendant "choked his wife and made threatening gestures with a handgun." Mr. Thomas "was called by one of the victims about what was happening." Mr. Thomas "armed himself with a rifle and came toward the apartment in question." Defendant was still armed with a handgun when Mr. Thomas arrived and an "armed confrontation then occurred . . . in the parking lot resulting in [Defendant] shooting [Mr. Thomas]." The report indicated that "[t]hree witnesses stated that the rifle was pointed down when [Defendant] shot [Mr. Thomas] multiple times."

Attached to the presentence report was a Strong-R assessment that was completed on July 24, 2019. The report stated that Defendant's "overall risk" was low. The report indicated that Defendant completed a drug and alcohol treatment program since his release on bail and that Defendant "had no drug use problem during the last six months." The assessment was completed before Defendant tested positive for amphetamines at his August 9, 2019 court appearance.

The presentence report also included a victim's impact statement in the form of a poem written by Bre Calloway, the mother of Mr. Thomas' children. In the poem she expressed the grief and hardship caused to her and her children by the death of Mr. Thomas.

### Trial Court's Oral Findings

Following argument, the trial court entered its ruling orally. The entire findings of the court are as follows:

> All right. Thank you both. Let [me] just mention, first of all, I checked the jail credit, he spent one year, nine months and four days

incarcerated total, that includes the three times that I gave him three days to serve.

Another thing I need to point out is that, you know, last year, 2018, there were 40,000 gun deaths in this country, 40,000, that's 109 deaths per day, four-and-a-half per hour. The year before there were 39,700 gun deaths, and the numbers just keep increasing, and that's a major, major problem in this country.

I recognize that [Defendant] is a military veteran, but I also recognize that there are many military veterans in this country, particularly those who came along with me, I came along in the Vietnam era where many people I have known who went through Vietnam, many of whom had PTSD and none of whom that I know have killed anyone since they came back from Vietnam, but, you know, that's -- so, I'm not strongly persuaded by veterans who went through war and then come back and say that, you know, I did these bad things after I came back because of what happened to me when I was in combat. I just really don't accept those.

Any rate. Court is persuaded by [section] 40-35-103, that is that confinement is necessary to avoid depreciating the seriousness of the offense and confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses.

A life was taken needlessly, no matter the circumstances of [Mr. Thomas], and, you know, in law, we always say that, you know, you take your victim as you find them, whether [Mr. Thomas] is a good person, bad person, honest person, dishonest person, it doesn't matter, if you take their [life] without justification, you have taken a life, and that's what happened in this particular case, a life was taken for which there has to be some kind of punishment, and that punishment is going to be 15 years at 60 percent, that's the judgment of the Court.

After entry of the judgments of conviction, Defendant timely filed a notice of appeal.

## ANALYSIS

Defendant claims that the trial court abused its discretion by sentencing him to serve his sentence in incarceration rather than granting an alternative sentence. The State argues that Defendant failed to show that the trial court erred in denying an alternative

sentence and that the evidence supports the trial court's decision. After a de novo review, we agree with the State that the evidence supports the denial of an alternative sentence.

## *Standard of Review*

A trial court's within-range sentencing decisions, if based upon the purposes and principles of sentencing, are reviewed under an abuse of discretion standard, accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The same standard applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "*Bise* specifically requires trial courts to articulate the reasons for the sentence in accordance with the purposes and principles of sentencing in order for the abuse of discretion standard with a presumption of reasonableness to apply on appeal." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013) (citing *Bise*, 380 S.W.3d at 698-99); *see also State v. Trent*, 533 S.W.3d 282, 292 (Tenn. 2017). When a trial court fails to articulate the reasons for denying an eligible defendant an alternative sentence, the abuse of discretion standard with a presumption of reasonableness does not apply on appeal and an appellate court can either (1) conduct a de novo review to determine whether there is an adequate basis for denying an alternative sentence; or (2) remand for the trial court to consider the requisite factors in determining whether to grant an alternative sentence. *Pollard*, 432 S.W.3d at 864.

## *Absence of Transcript of Plea Submission Hearing*

We note that the record on appeal does not include the transcript of the guilty plea submission hearing. It is the appellant's responsibility under Tennessee Rule of Appellate Procedure 24(b) to prepare a record adequate for an appellate court to address the issues on appeal. *Caudle*, 388 S.W.3d at 279. Even without the transcript of the guilty plea submission hearing, we determine that the record is sufficient for a meaningful review. *See id.* (stating that "the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in *Bise*").

## *Purposes of Sentencing*

Tennessee Code Annotated section 40-35-102 (2016) states that "[t]he foremost purpose of [the Tennessee Criminal Sentencing Reform Act of 1989] is to promote

justice, as manifested by [section] 40-35-103." Subsection 40-35-102(3) (2016) provides:

(3) Punishment shall be imposed to prevent crime and promote respect for the law by:

(A) [p]roviding an effective general deterrent to those likely to violate the criminal laws of this state;

(B) [r]estraining defendants with a lengthy history of criminal conduct;

(C) [e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants; and

(D) [e]ncouraging restitution to victims where appropriate[.]

### *Principles to be Applied to Implement Purposes*

Tennessee Code Annotated section 40-35-103(1) (2016), which lists certain principles to be applied to implement the purposes of sentencing, provides:

(1) Sentences involving confinement should be based on the following considerations:

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

### *Alternative Sentences*

Trial courts are encouraged to utilize alternative sentences. *See* Tenn. Code Ann. § 40-35-102(3)(C) (2016); *Ray v. Madison Cty., Tennessee*, 536 S.W.3d 824, 833 (Tenn. 2017). "Any sentence that does not involve complete confinement is an alternative sentence." *State v. Gregory Tyrone Dotson*, No. M2018-00657-CCA-R3-CD, 2019 WL

- 11 -

3763970, at *10 (Tenn. Crim. App. Aug. 9, 2019) (citing *State v. Fields*, 40 S.W.3d 435 (Tenn. 2001)).  Sentences of full probation and full community corrections are alternative sentences that do not involve any confinement.  A sentence of split confinement in which a defendant is required "to serve a portion of the sentence in continuous confinement for up to one year in the local jail or workhouse" followed with probation pursuant to Tennessee Code Annotated section 40-35-306(a) or followed with community corrections pursuant to Tennessee Code Annotated section 40-35-302(b) is an alternative sentence involving confinement.  Tenn. Code Ann. § 40-35-306 (2016); *see also Ray*, 536 S.W.3d at 833 (stating that a split confinement sentence is an alternative sentencing option that combines incarceration and rehabilitation).  Before a trial court sentences a defendant to a sentence involving confinement, including split confinement, the trial court should determine whether an eligible defendant is a suitable candidate for an alternative sentence that does not involve confinement—full probation or full community corrections.  *See State v. Tammy Marie Harbison*, No. M2015-01059-CCA-R3-CD, 2016 WL 613907, at *6 (Tenn. Crim. App. Feb. 12, 2016) (holding that the trial court erred by denying full probation and imposing a sentence of probation following six months in incarceration because there was "no substantial evidence in the record which would support the denial of probation"), *no perm. app. filed.*

### *Favorable Candidate for Alternative Sentencing*

Tennessee Code Annotated sections 40-35-102(5) and (6)(A) provide:

(5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration; and

(6)(A) A defendant who does not fall within the parameters of subdivision (5), and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary; however, a defendant's prior convictions shall be considered evidence to the contrary and, therefore, a defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing[.]

Tenn. Code Ann. § 40-35-102(5), (6)(A) (2016).

- 12 -

Before the 2005 amendments to the Sentencing Act, Tennessee Code Annotated section 40-35-102(6)(A) provided that a "defendant who does not fall within the parameters of paragraph (5) and is an especially mitigated or standard offender convicted of a Class C, D or E felony, is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." After the 2005 amendment, section 40-35-102(6)(A) only requires the trial court to "consider" whether or not the defendant is a favorable candidate, but the court "is not bound by the advisory sentencing guideline in this subdivision (6)." Tenn. Code Ann.§ 40-35-102(6)(D) (2016). Even if the court determines that a defendant is not a favorable candidate for an alternative sentence, the court can still impose an alternative sentence on an eligible defendant if the defendant proves that he or she is a suitable candidate for the alternative sentence. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). Likewise, the court can sentence a favorable candidate, who is eligible for an alternative sentence, to confinement if the defendant fails to prove that he or she is a suitable candidate for an alternative sentence.

### *Eligibility for an Alternative Sentence*

After considering whether a defendant is a favorable candidate for an alternative sentence, the trial court should next determine if the defendant is eligible for full probation or full community corrections.

### *Community Corrections*

Defendant was not eligible for a community corrections sentence because he was convicted of violent offenses and of offenses involving the use of a weapon. *See* Tenn. Code Ann. § 40-36-106 (C), (D) (2016).

### *Full Probation*

Probation is "a privilege" or "an act of grace" which may be granted to an accused who is eligible and "worthy of this largesse." *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). A defendant who is statutorily eligible for probation pursuant to Tennessee Code Annotated section 40-35-303(a) has "the right to a full and fair evidentiary hearing[,] and the right to all the procedural requirements contained in or necessarily contemplated by the statutory scheme." *Id*. at 619-20. A defendant does not have to file a petition seeking probation because "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants." Tenn. Code Ann. § 40-35-303(b). Tennessee Code Annotated section 40-35-303(a) provides:

A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less; however, no defendant shall be eligible for probation under this chapter if convicted of a violation of § 39-13-213(a)(2) [vehicular homicide by intoxication], § 39-13-304 [aggravated kidnapping], § 39-13-402 [aggravated robbery], § 39-13-504 [aggravated sexual battery], § 39-13-532 [statutory rape by an authority figure], § 39-15-402 [aggravated child abuse, aggravated child neglect, or aggravated child endangerment], § 39-17-417(b) [manufacture, deliver, sell, or possess with intent to manufacture, deliver or sell a Schedule I controlled substance] or (i) [specified large amounts of controlled substances], § 39-17-1003 [sexual exploitation], § 39-17-1004 [aggravated sexual exploitation] or § 39-17-1005 [especially aggravated sexual exploitation]. A defendant shall also be eligible for probation pursuant to § 40-36-106(e)(3) [a trial court can place a defendant, who was not initially eligible for probation, on probation after the defendant successful completes at least one (1) year of community corrections].

Defendant in this case was eligible for probation because the actual sentence imposed for each conviction was ten years or less, *see State v. Langston*, 708 S.W.2d 830, 832-33 (Tenn. 1986), and because the offenses for which Defendant was sentenced are not specifically excluded by Tennessee Code Annotated section 40-35-303(a).

### *Suitability for Probation*

A defendant who is eligible for probation has the burden of establishing his or her suitability for probation. Tenn. Code Ann. § 40-35-303(b) (2016). Based on the findings announced at the conclusion of the sentencing hearing, the trial court determined that Defendant was not suitable for probation based on Tennessee Code Annotated section 40-35-103(1)(B)—that "[c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses[.]"

### *Effective Deterrence*

To deny an alternative sentence based on the effective deterrence prong of Tennessee Code Annotated section 40-35-103(1)(B), "the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated." *State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000). The finding of deterrence cannot be conclusory only; the finding must be supported by proof. *State v. Ashby*, 823 S.W.2d 166, 170 (Tenn. 1991).

There was no proof presented during the sentencing hearing to support the need for deterrence, and there was no proof to support the gun deaths statistics cited by the trial court. Accordingly, the trial court erred in applying the effective deterrence prong of Tennessee Code Annotated section 40-35-103(1)(B) to deny an alternative sentence for which Defendant was eligible.

### *Seriousness of the Offense*

At the sentencing hearing, the trial court found that a "life was taken needlessly, . . . if you take their [life] without justification, you have taken a life, and that's what happened in this particular case, a life was taken for which there has to be some kind of punishment." "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2016). Although voluntary manslaughter is a serious offense that involves the killing of another, it is an offense that the legislature determined is eligible for a probated sentence. *See* Tenn. Code Ann. § 40-35-303(a).

It is clear from the oral findings at the sentencing hearing that the trial court used an element of voluntary manslaughter, the killing of another, to support its finding that "[c]onfinement is necessary to avoid depreciating the seriousness of the offense." The court articulated no additional findings or reasons to support the application of the seriousness of the offense prong of Tennessee Code Annotated section 40-35-103(1)(B). "When the seriousness of a defendant's crime is the sole reason for ordering incarceration, the circumstances of the particular crime committed by the defendant must be evaluated." *Trent*, 533 S.W.3d at 292. This court having determined that the trial court erred in applying the effective deterrence principle, the only remaining reason for denying probation found by the trial court was the seriousness of the offense. For the trial court to deny probation for this reason, the nature of the voluntary manslaughter committed by Defendant must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" and "the nature of the offense, as committed, outweighed all other factors . . . which might be favorable to a grant of probation." *State v. Travis*, 622 S.W.2d 529, 534 (Tenn. 1981). In *Trent*, the supreme court recognized that, even though *Travis* predated the Tennessee Criminal Sentencing Reform Act of 1989, the opinion's "vitality" has been upheld "in *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (per curiam) (citing *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006))." *Trent*, 533 S.W.3d at 292. As the *Trent* court explained, "If trial courts were permitted to deny probation solely on the basis of the elements of probation-eligible offenses, then the statute providing for probation-eligibility for those offenses would be rendered a nullity." *Id*.

In this case, the trial court erred in applying the seriousness of the offense prong of Tennessee Code Annotated section 40-35-103(1)(B) based *solely* on the killing of another.

### *De Novo Review*

The trial court erred in its application of the two principles on which it based its decision to deny an alternative sentence. Because the sentence of incarceration imposed by the trial court does not "reflect a decision based upon the purposes and principles of sentencing," the abuse of discretion standard with a presumption of reasonableness does not apply on appeal. *Caudle*, 388 S.W.3d at 279.

We determine that the record on appeal is adequate for this court to conduct a de novo review to determine whether there is a sufficient basis for denying an alternative sentence. In *Trent*, the supreme court recognized that the guidelines for diversion listed in *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998), are applicable in probation cases. *Trent*, 533 S.W.3d at 291; s*ee also State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000) ("The same guidelines are applicable in diversion cases as are applicable in probation cases, but they are more stringently applied to those seeking diversion."). When determining whether a defendant is eligible for probation, the trial court can consider: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. *Electroplating*, 990 S.W.2d at 229.

### *Amenability to Correction*

The evidence presented at the sentencing hearing, including the presentence report and Defendant's testimony, showed that Defendant was convicted of DUI, second offense, on January 19, 2016. He was on probation for that DUI, when he committed the offenses in this case on June 5, 2016. The evidence also shows that Defendant was on probation for a DUI, second offense, with a conviction date of March 2, 2014, when he was convicted of another DUI on September 16, 2014. Defendant admitted that he was drinking on the night of the shooting and that he had taken Xanax. He admitted to taking amphetamines after he was released on bail in this case. He also admitted that he tested positive for amphetamines during a drug test and that he failed to submit to a drug test on another occasion. Defendant's past conduct demonstrated that he is not amenable to correction.

- 16 -

## Circumstances of the Offense

According to the Metropolitan Nashville Police Department's homicide summary report included the presentence report, "[t]hree witnesses stated that the rifle [Mr. Thomas was holding] was pointed down" when Defendant shot Mr. Thomas. Mr. Patton testified that, when Mr. Thomas handed Defendant the bag containing Defendant's belongings, Defendant grabbed the front of Mr. Thomas' rifle with one hand, pushed the barrel down, and shot Mr. Thomas with his other hand. Mr. Patton said that, after Mr. Thomas was shot, he dropped the rifle and fell to the ground. Mr. Thomas, who was disarmed and lay wounded on the ground, did not pose a threat at the time Defendant stood over him and shot him four more times. This evidence was sufficient to show that the nature of this voluntary manslaughter was "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" and was, therefore, a sufficient ground upon which to deny an alternative sentence for which Defendant was eligible. *Travis*, 622 S.W.2d at 534.

## Defendant's Criminal Record

According to the presentence report, Defendant had no criminal record before he was discharged from the military. Since 2009, however, Defendant has been convicted of six misdemeanors—four DUIs, possession of a weapon while under the influence, and contempt of court. Although Defendant's criminal record does not include any felony convictions, Defendant's criminal record does not weigh in favor of an alternative sentence for which Defendant was eligible.

## Defendant's Social History

Defendant has a high school education, completed some college courses, and served honorably in the military. Defendant was honorably discharged from the United States Army based on injuries he received in Iraq. He was awarded a Bronze Star for bravery and a Purple Heart related to his combat injuries. However, Defendant's social history is not favorable since his discharge from the military. At the time Defendant committed the offenses in this case, his mother had custody of his four children, and he admitted using illegal drugs and alcohol to excess, even while he was on probation for prior DUIs and while released on bond in this case. Accordingly, we conclude that Defendant's social history since he was discharged from military service does not weigh in favor of an alternative sentence for which Defendant was eligible.

*Defendant's Physical and Mental Health*

Defendant testified that his physical health was good. Defendant suffers from PTSD related to his military service. Since his discharge from service, Defendant has used illegal drugs and has had numerous problems related to abuse of alcohol. We determine that Defendant's mental health does not weigh in favor of an alternative sentence.

*Deterrence Value to Defendant and Others*

As previously discussed, the record contains no proof concerning the deterrence value of a sentence of incarceration.

### *Principles Applied to Implement the Purposes of Sentencing*

As previously mentioned, courts may order sentences involving confinement when "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" "[c]onfinement is necessary to avoid depreciating the seriousness of the offense" or "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]" Tenn. Code Annotated § 40-35-103(1)(A), (B), and (C) (2016). Although Defendant does not have a long history of criminal conduct, the principles of section 40-35-103(1)(B) and (C) support a sentence of confinement. As discussed above, the evidence was sufficient to show that "confinement is necessary to avoid depreciating the seriousness of the offense." The nature of this voluntary manslaughter was "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." *Travis*, 622 S.W.2d at 534. Defendant has also failed previously on more than one occasion to comply with the terms of his probation.

### *Split Confinement*

Defendant argues that the trial court erred in denying an alternative sentence, including split confinement. As stated previously, split confinement is a sentence involving incarceration which, like sentences of full probation and full community corrections, should be based on the principles of Tennessee Code Annotated section 40-35-103(1) and the *Electroplating* factors. *Electroplating, Inc.*, 990 S.W.2d at 229.

We previously determined that Defendant failed to prove that he was a suitable candidate for full probation. For the same reasons, we determine that Defendant has not carried his burden of establishing his suitability for split confinement.

## CONCLUSION

Based on our de novo review, we affirm the denial of an alternative sentence. The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE