IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned On Briefs September 24, 2025

**STATE OF TENNESSEE v. AMANDA MICHELLE OWEN**

**Appeal from the Circuit Court for Blount County**
**No. C-28620 David R. Duggan, Judge**

_____

**No. E2024-01617-CCA-R3-CD**

_____

Defendant, Amanda Michelle Owen, appeals the eight-year sentence imposed for her Blount County Circuit Court guilty-pleaded conviction of theft of property valued at $60,000 or more but less than $250,000, a Class B felony, arguing that the trial court erred by imposing a sentence of full incarceration.  Because the record reflects that the trial court made the appropriate findings and that those findings are supported by the facts of this case, the trial court did not abuse its discretion by ordering that Defendant serve the entirety of her sentence in confinement, and, accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER, and JILL BARTEE AYERS, JJ., joined.

Joshua V. Lehde, Public Defender Fellow - Appellate Division, Franklin, Tennessee; and Mack Garner, District Public Defender, Maryville, Tennessee, for the appellant, Amanda Michelle Owen.

Jonathan Skrmetti, Attorney General and Reporter; Kristen A. Bell, Assistant Attorney General; Ryan K. Desmond, District Attorney General; and Tracy T. Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Blount County Grand Jury charged Defendant with one count of theft of property, to which she pleaded guilty, and, following a sentencing hearing, the trial court imposed a sentence of eight years' incarceration and $74,265 in restitution.

1

## Factual and Procedural Background

The indictment alleges that between August 1, 2020, and April 30, 2022, Defendant took more than $60,000 but less than $250,000 from Xtreme Marine without the effective consent of Xtreme Marine. Defendant pleaded guilty to the single charge in exchange for an eight-year sentence, with the manner of service to be determined by the trial court. No transcript of the guilty plea submission is included in the record, and the presentence report, which was entered as an exhibit at the sentencing hearing, does not contain a description of the offense. We glean the facts of the offense from the evidence presented at the sentencing hearing, which was conducted in two parts.

Elizabeth Edmonds, a manager in the accounting department at Xtreme Marine, testified that at the time of the offense, Defendant was working as an "accounts payable specialist." During the time frame of the indictment, Defendant made fraudulent charges totaling $215,994.36 using credit cards issued by Xtreme Marine to three different employees. Ms. Edmonds explained that Defendant was tasked with canceling credit cards returned to her when employees left the company. Defendant did not cancel one such card and, instead, used the card to make personal charges. In addition to using that card, Defendant, taking advantage of her role in the company, obtained the account numbers for cards assigned to two other employees and used them to make personal charges online.

Ms. Edmonds said that Defendant's scheme would have required "great effort to put those charges in accounts where . . . they would not be noticed" and "record[] them all so they balanced with the statement at the end of the month." She explained that, at the time, Xtreme Marine was "very understaffed" and relied on Defendant "to do the download and balance it." Ms. Edmonds discovered Defendant's malfeasance when another employee received what she initially believed was a "scam text" asking to reset the password on the credit card account and reported the text to Ms. Edmonds. Upon logging into that account, Ms. Edmonds discovered the use of the card that should have been canceled, which prompted a further investigation into the remainder of the charges. That investigation revealed "a lot of charges that had nothing to do with our business" to some 126 different vendors, including Bath & Body Works, City of Maryville, Dollywood, Facebook Pay, Michael Kors, and Old Navy.

David Metz, Chief Financial Officer for Xtreme Marine, testified that in addition to charges that "were pretty common from month to month," other charges such as supplies, materials, and labor would fluctuate. He explained that a person familiar with the statements could "plug these charges into" certain accounts and that "there's so much fluctuation if you're talking about a few thousand dollars you're not going to see it in any one month." Further, hiding the charges was particularly easy for Defendant because she was responsible for reviewing the charges each month. Mr. Metz said that both he and Ms. Edmonds "felt betrayed" and feared losing their jobs because of the staggering financial loss.

Mr. Metz said that Defendant had been employed with Xtreme Marine on two occasions and that when her recent thefts came to light, the company discovered that Defendant "had actually been stealing before she left, took on another role outside the organization, and then came back" and resumed making fraudulent charges. He testified that he noticed that over the course of the last year of her employment, Defendant "had joined a gym, she had gotten her eyelash extensions, was getting her hair, makeup," and "nails" done, which he believed she had done with company money. Although the company had confirmed fraudulent charges totaling more than $215,000, Xtreme Marine was asking for only $75,000 in restitution.

Defendant testified that at the time of sentencing, she was going through a divorce and that she and her fourteen-year-old daughter were living in a domestic violence shelter. She began her theft scheme during the COVID-19 pandemic by using a company card to purchase groceries at Walmart on two occasions because she was the only person in the house who was working at the time. When no one noticed the two charges, Defendant "got selfish" and started using the card to pay her rent and utilities. Then she used it to take her children to the beach and to purchase things for her home from Amazon. She admitted that she charged on average $6,000 per month.

Defendant admitted that she knew what she was doing was wrong and that she had no psychological problems that contributed to her crimes. She said that she had "smoked marijuana on and off my whole life" and that she was "currently on Suboxone" for a decades-old narcotics addiction. She denied using the money from the cards to purchase controlled substances.

Following her arrest, Defendant obtained full-time employment working in accounts payable for another company. She asked that she be placed on probation so that she could keep her job, continue to care for her family, and pay restitution.

Upon questioning by the trial court, Defendant admitted that she used company funds to travel, spending $5,764.54 to rent accommodations and $766.20 on airfare for a trip to the beach and $746.70 at Hearthside Cabin Rentals for a weekend in Gatlinburg. She also used company funds for entertainment for her family, spending $1,033.15 on season passes to Dollywood; $1,098.50 on a yearly pass to the Knoxville Zoo; and $20 on a video game for her daughter. Defendant purchased a large amount of clothing, spending $9,825.75 at Wantable; $1,034.03 at Fashion File; and $347.33 at Victoria's Secret. She also purchased luxuries for her home, including $2,157.66 at Purple for a mattress and $922.55 at Bed Jet for a device to blow cool or warm air over her while she slept. She spent $269.78 at Jessica's Kiss Collection for skincare and makeup. Defendant used company funds totaling $2,464.26 at Banfield Pet for surgery on her cat. Defendant used the stolen funds to pay $23,001.09 in rent for her residence and to buy $1,142.75 in prepaid gift cards. Defendant spent $30,487.72 at Walmart on clothing and food. Defendant could not recall the purpose of the $36,987.56 in charges she made to PayPal, the $1,616.28 to

Red Awning Rentals, or the $1,764.43 to SP Silly George. The largest total amount, $41,964.31, was spent on 644 separate purchases from Amazon for home décor, clothing, and Christmas decorations. Defendant also used one card to pay for an office visit to the doctor monitoring her Suboxone treatment. Defendant agreed that it was somewhat misleading to claim that she had made these purchases out of a need for her family.

At the conclusion of the hearing, the State asked the trial court to deny alternative sentencing based upon Defendant's abuse of a position of trust, criminal history, and the degree of financial loss to the company. The State argued that $215,994.36 was well in excess of the $60,000 threshold for Class B felony theft. Defendant agreed that she had abused a position of private trust and asserted that, although the amount of loss was great, it was within the limitations for the convicted offense. She argued that during her two and a half years on bond, she had managed to obtain full-time employment and abide by the conditions of her bond without supervision. She emphasized that her offense did not cause or threaten bodily harm and that she had never been in trouble before. She admitted culpability and expressed remorse for her actions.

The trial court found that although Defendant had no previous criminal convictions, she did have a history of criminal behavior based on her marijuana and opiate abuse. *See* Tenn. Code. Ann. § 40-35-114(1). The trial court determined that Defendant abused a position of private trust to facilitate her crime. *See* Tenn. Code Ann. § 40-35-114(14). In considering whether Defendant had satisfied her burden of proving that she was a favorable candidate for probation, the trial court noted "important pieces" weighing in favor of probation. Nevertheless, the trial court observed that "this is a very extensive theft" and that Defendant did not use the money on necessities alone. The court found that "some risk" existed that, should she be released on probation, Defendant would reoffend "simply because of the extent of this theft and the types of things this money was used for." The court agreed that Defendant had not been on probation before and that she had obtained another job in accounts payable. The court concluded that denying probation was necessary to protect society from future criminal conduct by Defendant and that granting probation would depreciate the seriousness of the offense. Ultimately, the trial court sentenced Defendant to serve her eight-year sentence in confinement and $74,265 in restitution[1].

## Analysis

On appeal, Defendant asserts that the trial court abused its discretion by ordering her to serve her entire sentence in confinement, arguing that the court erred by ordering full confinement based on the seriousness of the offense without making a finding that the

---

[1] By agreement of the parties, the victim sought the lesser amount of restitution, as opposed to the $215,994.36 amount for which the State argued Defendant should be held accountable.

circumstances of the offense were extreme. The State contends that the trial court did not abuse its discretion and that the record supports the sentence of full confinement.

We review the length and manner of service of within-range sentences under an "abuse of discretion standard with a 'presumption of reasonableness'" afforded to the ruling of the trial court so long as the court "place[s] on the record any reason for a particular sentence." *State v. Bise*, 380 S.W.3d 682, 705, 708 (Tenn. 2012). There is no presumption of reasonableness when the trial court fails to consider and weigh the appropriate factors. *See State v. King*, 432 S.W.3d 316, 327-28 (Tenn. 2014); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). "[T]he abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions," *King*, 432 S.W.3d at 324 (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)), including "questions related to probation or any other alternative sentence," *Caudle*, 388 S.W.3d at 279, and the trial court's decision to impose consecutive sentencing, *see Pollard*, 432 S.W.3d at 860. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

We will uphold the trial court's sentencing decision on appeal "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. A defendant bears the burden of proving that the sentence is improper. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmt.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

As a Range I offender sentenced to a term of ten years or less, Defendant was eligible for probation. *See* Tenn. Code Ann. §40-35-303(a). Eligibility does not equal entitlement, and the defendant bears the burden of establishing suitability for probation, including making a demonstration "that probation will 'subserve the ends of justice and the best interest of both the public and the defendant." *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citations omitted). When addressing a defendant's suitability for probation, the trial court should consider: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017).

Before imposing a sentence of confinement, the trial court must consider whether

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

Tenn. Code Ann. § 40-35-103(1)(A)-(C).

The record reflects that the trial court considered the evidence presented at the sentencing hearing, the presentence report, the presence of enhancement and mitigating factors, the purposes and principles of sentencing, and the nature and circumstances of the offense. Because the trial court considered and weighed the appropriate factors, we will apply a presumption of reasonableness to the trial court's sentencing decision. *King*, 432 S.W.3d at 327.

The trial court expressed particular concern about the nature and circumstances of the offense, noting that it was a "very extensive theft" far in excess of the agreed restitution amount, that the offense was "particularly enormous," and that the need to protect society from Defendant's future criminal conduct was great. The trial court concluded that confinement was necessary to avoid depreciating the seriousness of the offense. Our supreme court has concluded that to support the denial of alternative sentencing, the circumstances of the offense "as committed, must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." *State v. Travis*, 622 S.W.2d 529, 534 (Tenn. 1981). Our legislature codified this principle in Code section 40-35-103(1)(B). *See State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997) (first citing *State v. Hartley*, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991); and then *State v. Fletcher*, 805 S.W.2d 785, 787 (Tenn. Crim. App. 1991)).

Regarding the circumstances of the offense, the court found that Defendant stole more than $200,000 from her employer over the course of nearly two years and used the money to fund an elaborate lifestyle. Contrary to Defendant's assertion, the trial court did not improperly focus on the amount of the theft, which was incorporated into the elements of the offense, but on the way in which the theft occurred and the nature of Defendant's purchases. Defendant did not commit a single large taking but, by her own admission, abused her position of trust within the company to facilitate and cover up a series of thefts over an extensive period. Defendant's scheme ended only because it was discovered. The court also expressed concern that Defendant tried to use COVID-19 and family needs to justify starting her scheme and had no explanation for continuing to use the purloined cards for years "other than she [is] selfish." The court concluded that confinement was necessary to protect the public from Defendant, questioning the sincerity of Defendant's remorse and expressing concern that Defendant would reoffend in the same manner given that she had

6

stolen from Xtreme Marine when previously employed there and then resumed the theft upon her return to employment there.  In our view, the record demonstrates that the trial court made the appropriate findings and that those findings are supported by the facts of this case.  Accordingly, we conclude that the trial court did not abuse its discretion by ordering that Defendant serve the entirety of her sentence in confinement.

## Conclusion

Because the record supports the denial of alternative sentencing, we affirm the judgment of the trial court.


<u>s/ Matthew J. Wilson</u><br>
MATTHEW J. WILSON, JUDGE

7